**SANTA ROSA BAND OF INDIANS et al., Plaintiffs-Appellees,**

v.

**KINGS COUNTY et al., Defendants-Appellants.**

**No. 74–1565.**

United States Court of Appeals, Ninth Circuit.

Nov. 3, 1975.

Rehearing and Rehearing In Banc Denied March 26, 1976.

---

Larry G. McKee (argued), Deputy County Counsel, County of Kings, Hanford, Cal., for defendants-appellants.

George Forman (argued), of Cal. Indian Legal Services, Oakland, Cal., for plaintiffs-appellees.

## OPINION

Before KOELSCH and DUNIWAY, Circuit Judges, and KELLEHER,* District Judge.

KOELSCH, Circuit Judge:

This case presents important questions regarding the extent of the civil jurisdiction over Indian reservation trust lands conferred upon state and local governments by P.L. 280, 28 U.S.C. § 1360. Specifically, the suit is a controversy between the Santa Rosa Band of Indians together with two individual members and Kings County, California, over the applicability of the County's Zoning Ordinance and Building Code on the Santa Rosa Rancheria, the Band's reservation. The Santa Rosa Band is an Indian Tribe, organized under § 476 of the Indian Reorganization Act of 1934, 25 U.S.C. §§ 461–478 (1970); legal title to the Rancheria lands is held in trust by the United States for the use and benefit of the Band. *See* 25 U.S.C. § 465.

The background of the dispute is this:

■ Plaintiffs Barrios and Baga are members of the Santa Rosa Band. They are both poor. Each has been living with his family on an assignment (a plot of the trust land) within the Rancheria, but in totally inadequate housing. To remedy his family's housing problems, each applied in early 1973 to the Bureau of Indian Affairs (B.I.A.) for assistance in procuring mobile homes under the Bureau's Housing Improvement Program (H.I.P.). After examining the purchase documents for the mobile homes tentatively selected, the B.I.A. approved both purchases, and authorized the maximum H.I.P. grants available, $3,500, to apply towards the purchase prices. At the same time, the Indian Health Service (I.H.S.), an agency within the Department of Health, Education and Welfare, as part of a widespread project to upgrade various California Reservation water and sanitation systems, made plans to provide plaintiffs' H.I.P. housing with water and sanitary plumbing.[1]

However, after purchasing the mobile homes, plaintiffs learned that under § 402 of the County Zoning Ordinance (Kings County Ordinance No. 269) the Rancheria was zoned as a General Agricultural District, and, under § 402C(7), that use of a mobile home as a residence in such an area

---

* The Honorable Robert J. Kelleher, United States District Judge for the Central District of California, sitting by designation.

1. During oral argument the court on its own motion raised the issue of whether or not this dispute presented a justiciable case or controversy. In supplemental memoranda both parties took the affirmative, but on different bases. Appellees argued that the record affirmatively established actual threats of Kings County's enforcement of its Zoning Ordinance. Appellants, on the other hand, urged that although no direct enforcement action against the Rancheria is apparent, the very existence of the Ordinance is sufficient here to create a justiciable controversy. The court has only recently removed all doubt concerning this question. In *Construction Industry Assn. of Sonoma County v. The City of Petaluma,* 522 F.2d 897 (9th Cir. 1975), we held that a zoning ordinance which operated of itself adversely to affect the value and marketability of the owners' lands for residential uses constituted a sufficient threat of a direct and personal injury to the landowners to enable them to commence and prosecute a declaratory suit. We thus turn to the merits.

is permitted only with prior administrative approval, and then only for a maximum period of two years. Plaintiffs were informed by County officials that to obtain the discretionary administrative approval an application had to be submitted to the County Zoning Administrator, accompanied by a fee to defray the Planning Department's expense in preparing a required environmental impact report, and a site plan. Approval is granted if the Administrator decides that the proposed use is in conformity with the other provisions and objectives of the Zoning Ordinance. § 1803, Zoning Ordinance. Plaintiffs were advised that the County Building Code required inspections and permits for utility hookups and for the plumbing work which the I.H.S. planned to perform; these permits, too, entailed payment of fees. Plaintiffs lack money to pay the fees to seek the permits and have been unable to obtain mail service, utility hookups, or the I.H.S. water and sanitation services; they are presently deprived of the full use of the housing.

Being of the opinion that the County lacked jurisdiction to enforce its land use ordinances on the Rancheria, Barrios and Baga, and the Santa Rosa Band (several of whose members are presently awaiting H.I.P. mobile home grants) brought this action for declaratory and injunctive relief to restrain enforcement of the ordinances. The district court granted the requested relief. The County appealed; we affirm, except for some modification we require in the judgment entered below.

At the outset, we emphasize that this suit involves an attempt to regulate Indian use of Indian trust lands. We are clear, regardless of the modification worked in the exclusive Federal jurisdiction and tribal sovereignty doctrines of *Worcester v. Georgia,* 31 U.S. (6 Pet. 515) 350, 8 L.Ed. 483 (1832), by subsequent Court decisions such as *Organized Village of Kake v. Egan,* 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962) and *Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), that in any event any concurrent jurisdiction the states might inherently have possessed to regulate Indian use of reservation lands has long ago been preempted by extensive Federal policy and legislation. *Warren Trading Post v. Arizona Tax Comm'n,* 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965); *McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 176, 176 n.15, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973); *Williams v. Lee, supra,* 358 U.S. at 220–221, 79 S.Ct. 269. Congress, by the Indian Reorganization Act, authorized the government to purchase the lands involved here, and to hold the title in trust; it also authorized adoption of a tribal constitution for the exercise of tribal self-government over the area. 25 U.S.C. § 476. Against the historical backdrop of tribal sovereignty (subject only to the paramount power of the United States) over reservation lands, we have little doubt that Congress assumed and intended that states had no power to regulate the Indian use or governance of the reservation provided, except as Congress chose to grant that power. *McClanahan, supra,* 411 U.S. at 175, 93 S.Ct. 1257.[2] Indeed, P.L. 280, by defining the limits of

---

2. In *McClanahan* the Court disclaimed reliance on the *Worcester v. Georgia* "platonic" notion of Indian sovereignty in favor of a pre-emption approach, but, as we read its opinion, reached a conclusion very similar to that which would obtain under *Worcester v. Georgia*—that states may not regulate or tax Indian use of the reservation absent Federal consent. The Court distinguished state efforts to regulate off-reservation Indian activities, or reservation activities of non-Indians, from state efforts to tax or regulate Indian use of the reservation, holding the latter pre-empted by the grant of the reservation. Hardly any other result could be reached, either in *McClanahan* or here. The

historical model provided by *Worcester v. Georgia* has been used continuously in congressional policy towards the Indians. Reservation of trust lands has long provided a major vehicle for Federal policy towards Indians, and Congress has passed a myriad of statutes over the years dealing with their purchase, allocation, regulation, maintenance and use. *See, e. g.,* 25 U.S.C. §§ 381–390, 391–415, 461–465, 483, 502, 1451, 1466, 1496(f). Congress fashioned a criminal justice system which divided jurisdiction between the federal courts and Indian tribal courts, excluding the states except as to crimes committed on reservations in which neither perpetrators nor victims are Indians. *See*

the jurisdiction granted "P.L. 280 states" such as California, necessarily pre-empts and reserves to the Federal government or the tribe jurisdiction not so granted. *See McClanahan, supra,* at 172 n.8, 93 S.Ct. 1257. *Cf. Kennerly v. District Court,* 400 U.S. 423, 91 S.Ct. 480, 27 L.Ed.2d 507 (1971).

■ Thus the County is without jurisdiction to enforce its zoning ordinance or building code on the Rancheria unless such jurisdiction is explicitly granted by P.L. 280, 28 U.S.C. § 1360. We hold, for a number of alternative reasons, that P.L. 280 does not confer such jurisdiction.

The statute provides:

"§ 1360. State civil jurisdiction in actions to which Indians are parties

"(a) [California] . . . shall have jurisdiction over civil causes of action between Indians or to which Indians are parties which arise [within any Indian country within the state] . . . to the same extent that [California] . . has jurisdiction over other civil causes of action, and those civil laws of such State or Territory that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State or Territory:

\*   \*   \*   \*   \*   \*

"(b) Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States . ' . . ; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal

treaty, agreement, or statute or with any regulation made pursuant thereto; or shall confer jurisdiction upon the State to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein.

"(c) Any tribal ordinance or custom heretofore or hereafter adopted by an Indian tribe, band, or community in the exercise of any authority which it may possess shall, if not inconsistent with any applicable civil law of the State, be given full force and effect in the determination of civil causes of action pursuant to this section. . . . "

### I.  Grant of P.L. 280 jurisdiction to local governments

The first impediment to enforcement of the County ordinances is that they are not "civil laws of [the] State . . . that are of general application . . . within the State . . . ."

This is a matter of first impression for this court; district courts in this circuit have split on the issue.[3] Plaintiffs, contending that local ordinances are not state laws of "general application . . . elsewhere within the State," rely on *Donelon v. New Orleans Terminal Co.,* 474 F.2d 1108 (5th Cir. 1973) (holding local ordinances not state laws within the meaning of the Railroad Safety Act of 1970, 45 U.S.C. § 434), and *Moody v. Flowers,* 387 U.S. 97, 87 S.Ct. 1544, 18 L.Ed.2d 643 (1967) (holding local ordinances are not state statutes within the meaning of 28 U.S.C. § 2281, requiring convening of a three-judge district court to enjoin a state statute). *See Board of Regents v. New Left Education Project,* 404

---

18 U.S.C. §§ 1152, 1153; C. Goldberg, *Public Law 280: The Limits of State Jurisdiction over Reservation Indians,* 22 U.C.L.A.L.Rev. 535, 541 (1975). And it gave governing power over the reservation to tribal governing authorities subject to Federal supervision. *See* 25 U.S.C. § 476, 25 U.S.C. § 1301 *et seq. See United States v. Mazurie,* 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975). We think it unquestionable that the history of congressional dealings with the Indian trust lands is more than adequate to evidence an intent to oust state regula-

tion over the same lands. *See Warren Trading Post, supra.*

3. The district court in this case, in an unreported opinion, held that local ordinances were not made applicable by P.L. 280. *Santa Rosa Band of Indians v. Kings County,* Civ. No. F–836 (E.D.Cal. Oct. 12, 1973). *Compare Rincon Band of Mission Indians v. County of San Diego,* 324 F.Supp. 371, 373–376 (S.D.Cal.1971), *rev'd on other grounds,* 495 F.2d 1 (9th Cir. 1974).

U.S. 541, 92 S.Ct. 652, 30 L.Ed.2d 697 (1972). The County relies on California cases recognizing that the County is authorized to exercise home rule by the state constitution[4] and within its jurisdiction exercises the state's police power, and on cases such as *Atlantic Coast Line R. Co. v. City of Goldsboro,* 232 U.S. 548, 34 S.Ct. 364, 58 L.Ed. 721 (1914), which hold such local ordinances to be state law within the meaning of the Federal Constitution, and present 28 U.S.C. § 1257, for purposes of determining the appellate jurisdiction of the Supreme Court. *See Restatement (Second) Conflict of Laws* § 3, comment b (1969).

On the whole we find those cases unhelpful except insofar as they demonstrate the obvious—that the phrase "state statute" (and even more so, "civil laws of [the] State or Territory that are of general application . . . elsewhere within the State . . . .") is ambiguous. *See* Note, *The Extension of County Jurisdiction over Indian Reservations in California: Public Law 280 and the Ninth Circuit,* 25 Hastings L.J. 1451, 1485 (1974). The statute may be read either as only making applicable to Indian reservations those civil laws passed by the state legislature which are of statewide application, or, additionally, also to make applicable county or municipal ordinances which apply equally to Indians and non-Indians.[5]

■ To resolve that ambiguity in P.L. 280, we begin with the fundamental postulate, enunciated in *Worcester v. Georgia,*

*see* 31 U.S. at 393, that ambiguities in Federal treaties or statutes dealing with Indians must be resolved favorably to the Indians. *See McClanahan, supra,* 411 U.S. at 174–175, 93 S.Ct. 1257; *Menominee Tribe v. United States,* 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968); *Kimball v. Callahan,* 493 F.2d 564 (9th Cir. 1974). This principle is somewhat more than a canon of construction akin to a Latin maxim, easily invoked and as easily disregarded. It is an interpretive device, early framed by John Marshall's legal conscience for ensuring the discharge of the nation's obligations to the conquered Indian tribes. The Federal government has long been recognized to hold, along with its plenary power to regulate Indian affairs, a trust status towards the Indian—a status accompanied by fiduciary obligations. *See Seminole Nation v. United States,* 316 U.S. 286, 297, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942); *United States v. Kagama,* 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 (1886); *Beecher v. Wetherly,* 95 U.S. 517, 525, 24 L.Ed. 440 (1877); *Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 12, 8 L.Ed. 25 (1831).[6] While there is legally nothing to prevent Congress from disregarding its trust obligations and abrogating treaties or passing laws inimical to the Indians' welfare, the courts, by interpreting ambiguous statutes in favor of Indians, attribute to Congress an intent to exercise its plenary power in the manner most consistent with the nation's trust obligations. *See Squire v. Capoeman,* 351 U.S. 1, 7–8, 76 S.Ct. 611, 100 L.Ed. 883 (1956).

---

**4.** Section 7, Article XI, of the California Constitution provides:

"A county or city may make and enforce within its limits all local, police, sanitary and other ordinances and regulations not in conflict with general laws."

**5.** The plaintiffs point out that the local ordinances involved here have no force and effect in the State of California outside the County, and argue that to read "civil laws of such State" to include the County ordinances renders nugatory the clause "same force and effect . . . as they have elsewhere within the State . . . ." There is some force to plaintiffs' contention, but it is inconclusive; the county in which the local ordinance has force is "elsewhere within the State . . . " in the sense that it is not within Indian country, and

the local legislation thus made effective is not directed solely at the reservation. While the latter reading is admittedly somewhat strained, we think it sufficiently plausible that we choose to rest on a different ground.

**6.** In *Kagama* the Court stated:

"These Indian tribes *are* the wards of the nation. . . . Because of the local ill feeling, the people of the states where they are found are often their deadliest enemies. From their very weakness and helplessness, so largely due to the course of dealing of the *federal government with them, and the treaties in which it has been* promised, there arises the duty of protection, and with it the power." 118 U.S. at 383–384, 6 S.Ct. at 1114.

Applying that principle of construction here, we have little difficulty in concluding, in light both of the immediate burden the County ordinances would place on these plaintiffs, and more generally of the devastating impact the County's construction of the statute would have on tribal self-rule and tribal economic development of reservation resources,[7] that P.L. 280 subjected Indian Country only to the civil laws of the state, and not to local regulation.

The County argues that because P.L. 280, and particularly the legislative history of the act, is assimilationist in tone, a congressional intent to make the broader grant of jurisdiction must be found. (Indeed, seizing on language in the legislative history indicating the desirability of making Indians full and equal citizens, a district court in this circuit has interpreted the statute as equally subjecting reservation Indians to the full panoply of state, county and municipal ordinances faced by other citizens. *Rincon Band of Mission Indians v. County of San Diego,* 324 F.Supp. 371, 373–376 (S.D.Cal.1971), rev'd on other grounds, 495 F.2d 1 (9th Cir. 1974), *cert. denied,* 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974). *See* Hastings L.J., *supra,* at 1488–1489; C. Goldberg, *Public Law 280: The Limits of State Jurisdiction over Reservation Indians,* 22 U.C.L.A.L.Rev. 535, 581 (1975) [hereinafter Goldberg]). We cannot agree; we are unpersuaded by such general statements of assimilationist intent in the context of the specific problem at hand.

There is nothing specific in the legislative history shedding any light on whether or not Congress intended to subject reservation trust lands to local civil or criminal ordinances. If anything, the legislative history indicates that Congress gave the problem little, if any, thought. The original impetus for P.L. 280 was a perceived need to extend state criminal jurisdiction to certain California reservations; by the time the bill was passed, it had mushroomed into a general measure conferring a degree of state criminal and civil jurisdiction on several states. However, civil jurisdiction was extended almost as an afterthought. There is very little in the legislative history indicating the congressional rationale for extending civil jurisdiction, or to indicate the extent of that jurisdiction. *See* Goldberg, at 540–544. And there is no indication that Congress gave any thought or study to the effects on, or prospective nature of, the relationship, insofar as regulation of reservation civil affairs was concerned, which would thereafter exist between the B.I.A., administrator of the trust property, the states, local governments, and Indian tribes, which theretofore exercised substantial self-government over the reservation. In light of the absence of more specific guidance in the statute or legislative history, we decline to extend jurisdiction to the County solely on the basis of general expressions of sentiment regarding the desirability of terminating Federal paternalistic supervision of tribes or the need for making Indians equal first class citizens—a construction denying the County jurisdiction probably serves those purposes as well or better than one granting it.

Moreover, despite the broad language in the legislative history, the statute itself is not altogether assimilationist in character, and was passed against a substantial backdrop of Indian legislation and policy with which it must be integrated. As one commentator recently noted:

"Over the years, Congress and the Department of the Interior, which have shared responsibility for formulating and implementing federal Indian policy, have operated on a variety of divergent models for appropriate interaction between the Indians and the states. One model focuses on the inclusion of Indian reservations within state boundaries, the rights of Indians as state citizens, and the desirability of Indian assimilation into the mainstream of American culture; its policy implications have included removing Indian lands from trust status and subjecting Indians to state law.[7] Another model focuses on the unique status of Indian tribes as sovereignties antedating the Eu-

---

7. *See* Goldberg, *supra* n.1, at 575–576; Hastings L.J., at 1458.

ropean settlement of America, the special federal responsibility for Indian welfare, and the decentralized nature of jurisdiction in the United states generally; it has tended to produce policies fostering tribal autonomy and economic development of reservations through federal training, subsidies, loans, technical assistance, and insulation from the burdens of state law.[8] In between are models which favor either assimilation or tribal autonomy, but interpose the federal government as an umpire, protecting Indian or state interests against extreme abuses by the other." Goldberg, at 536. (footnotes quoted below)[8] *See* Hastings L.J., *supra,* at 1463–1469.

While on balance P.L. 280 reflects an assimilationist slant in Federal policy,[9] it is a compromise measure. *See* Goldberg, at 537; Hastings L.J., *supra,* at 1489. It did not end the tax exempt status of trust lands, *see* § 1360(b), and significantly limited state regulation of Indian trust property. Most importantly, P.L. 280, while passed with an eye towards eventual termination of Federal supervision over Indian tribes and Indian trust territory, is not itself a termination statute. Congress, recognizing that most Indian tribes living on restricted lands in 1953 were economically or educationally unprepared for termination, undertook a more gradual process; P.L. 280 is

only a part of that process. The statute shifted jurisdiction over Indian Country from the Federal government to the states in some respects, but in others prolonged existing Federal supervision and Indian immunity from state jurisdiction, awaiting the decision by Congress, on a case-by-case basis, that termination of a particular tribe, with consequent imposition of all aspects of state jurisdiction,[10] was appropriate. The broad language in the legislative history relied on by the County announces the congressional objectives of the entire termination process, but was not meant to describe the interim status of Indians or trust lands before completion of the process.

■ From that perspective, we conclude that Congress did not contemplate immediate transfer to local governments of civil regulatory control over reservations. Prior to passage of P.L. 280, Congress had encouraged, under § 476 of the Indian Reorganization Act, the formation and exercise of tribal self-government on reservation trust lands. A construction of P.L. 280 conferring jurisdiction to local county and municipal governments would significantly undermine, if not destroy, such tribal self-government. By transferring regulation of all matters of local concern to local governments, the tribal government would be left little or no scope to operate. We think it

**8.** "7. This policy shaped the Allotment Act of 1887, ch. 119, 24 Stat. 388–91 (profusely amended, this Act is still in force, 25 U.S.C. §§ 331–58 (1970)), which distributed reservation lands to individual Indians as an incentive to the development of an agrarian way of life. The allotted lands were to be removed from trust status when the Indians demonstrated their adaptation to that way of life. Although no such alteration occurred, the allotment system resulted in indiscriminate liquidation of the federal trust responsibility, often over Indian protests, and a sharp decline in Indian land holdings.

"The same policy accounted for the numerous statutes passed during the 1950's terminating the trust status of individual reservations. *See, e. g.,* 25 U.S.C. § 677 (1970) (Ute); 25 U.S.C. §§ 691–708 (1970) (western Oregon tribes); 25 U.S.C. §§ 891–902 (1970) (Menominee).

"8. Tribal self-government and economic development were encouraged by the Indian

Reorganization Act of 1934, 25 U.S.C. §§ 461–78 (1970).

"A return in recent years to similar policies is manifested in President Nixon's 1970 Message to Congress, 116 Cong.Rec. 23131 (1970), and in recent federal legislation facilitating long-term leasing of Indian land. 25 U.S.C. § 415 (1970). *See also* S.Con.Res. 26, 92d Cong., 1st Sess. (1971); S. 3157, 92d Cong., 2d Sess. (1972)." Goldberg, at 536 n.7 and 8.

**9.** The statute was passed *in pari materia* with the Menominee Termination Act, 25 U.S.C. § 891 *et seq.,* and the Klamath Termination Act, 25 U.S.C. § 564 *et seq.*

**10.** *Compare* P.L. 280, conferring pre-termination jurisdiction, *with* 25 U.S.C. § 564q, the provision of the Klamath Termination Act conferring post-termination jurisdiction on the state.

more plausible that Congress had in mind a distribution of jurisdiction which would make the tribal government over the reservation more or less the equivalent of a county or local government in other areas within the state, empowered, subject to the paramount provisions of state law, to regulate matters of local concern within the area of its jurisdiction. *See* Goldberg, at 581.

This view finds support in the provisions of § 1360(c), which contemplates the continued vitality and operation of the tribal government.[11] *See* Goldberg, at 582. If Congress had intended local governments to supplant tribal ones in regulating matters of concern local to the reservation, we doubt it would have included a provision establishing the continuing validity of tribal ordinances.[12] Furthermore, Indians, who do not own the fee to reservation lands, are unable under many state laws to incorporate reservation lands in order to acquire law-making powers. *See* Cal. Gov't Code § 34301 (West Supp.1974). Thus, the position urged by the County would not only ascribe to Congress the intent substantially to strip Indian tribes of their sphere of self-regulation, but also to leave them in the unequal position of being unable to obtain the measure of self-determination provided by state law to its other citizens.

A construction of P.L. 280 denying jurisdiction to local governments comports with the present congressional Indian policy. The assimilation policy reflected in P.L. 280 was to a great extent a failure, *see* Hastings L.J., at 1471–1473, and has been discarded[13] in favor of policies fostering Indian autonomy, reservation self-government and economic self-development. *See* n.7 *supra. See* Indian Financing Act of 1974, 25 U.S.C. § 1451 *et seq.;* Hastings L.J., at 1472–1473; Goldberg, at 549–551; Comment, *State Jurisdiction Over Indian Land Use: An Interpretation of the "Encumbrance" Savings Clause of Public Law 280,* 9 Land and Water L.Rev. 421, 428–429 (1974); Price, Law and the American Indian 596 *et seq.* (1973), and sources there cited. While we recognize an obligation to follow the congressional intent when construing P.L. 280, we are not obliged in ambiguous instances to strain to implement a policy Congress has now rejected, particularly where to do so will interfere with the present congressional approach to what is, after all, an ongoing relationship. *See Capitan Grande Band of Mission Indians v. Helix Irrigation District,* 514 F.2d 465, n.2 (9th Cir., 1975).

As previously noted, extension of local jurisdiction is inconsistent with tribal self-determination and autonomy. Were regulation of reservation affairs preempted by local governments, present tribal governments would be relegated to the positions of overseers of tax-exempted property, or the board of directors of a business. We are reluctant to enforce such a result, for as the Court recently recognized, tribal governments have long been thought and held to have inherent sovereign powers of government within Indian Country.

"Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory, *Worcester v. Georgia,* 6 Pet. (31 U.S.) 515, 557 [8 L.Ed. 483] (1832); they are 'a separate people' possessing 'the power of reg-

---

**11.** "Any tribal ordinance . . . heretofore or hereafter adopted by any Indian tribe . . . shall, if not inconsistent with any applicable civil law of the State, be given full force . . . ." 28 U.S.C. § 1360(c).

**12.** The substantial exceptions attached in § 1360(b) to state exercise of jurisdiction over trust property—precisely the area over which Indian tribes exercise self-government—indicate a congressional unwillingness to subject Indian use of the reservation to hostile legislation even by the state, and are hence inimical to the claims of the reservation's local neigh-

bors, who are potentially more hostile to the Indians than the state-wide government, that they were given authority identical to the state's under § 1360(a) to regulate use of the reservation.

**13.** The Indian Civil Rights Act of 1968, codified at 25 U.S.C. §§ 1311, 1312, 1321–1326, amended P.L. 280 by making state assumption of jurisdiction contingent upon tribal consent, thereby ending the process of unwilling termination.

ulating their internal and social relations . . . .' *United States v. Kagama,* 118 U.S. 375, 381–382 [6 S.Ct. 1109, 1113, 30 L.Ed. 228] (1886); *McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 173 [93 S.Ct. 1257, 1261–1262, 36 L.Ed.2d 129] (1973).

"Cases such as *Worcester, supra,* and *Kagama, supra,* surely establish the proposition that Indian tribes within 'Indian country' are a good deal more than 'private, voluntary organizations', . . . These same cases in addition make clear that . . . [Indian tribes are] . . entities which possess a certain degree of independent authority over matters that affect the internal and social relations of tribal life. . . . " *United States v. Mazurie,* 419 U.S. 544, 95 S.Ct. 710, 717, 42 L.Ed.2d 706, 716–717 (1975).

Moreover, tribal use and development of tribal trust property presently is one of the main vehicles for the economic self-development necessary to equal Indian participation in American life. Extension of local jurisdiction to the reservation would burden that development by increasing its cost. For instance, the building code dealt with in *Ricci v. County of Riverside,* Civ. No. 71–1134–EC (C.D.Cal., Sept. 9, 1971), *appeal dismissed as moot,* 495 F.2d 1 (9th Cir. 1974), by prescribing quality standards for building materials, made the cost of constructing a home on the reservation prohibitive to most reservation Indians, thereby effectively, albeit unintentionally, locking them into substandard housing conditions. *See* Hastings L.J., at 1474–1475, 1487. But more critically, subjecting the reservation to local jurisdiction would dilute if not altogether eliminate Indian political control of the timing and scope of the development of reservation resources, subjecting Indian economic development to the veto power of potentially hostile local non-Indian majorities. Local communities may not share the usually poorer Indian's priorities, or may in fact be in economic competition with the

Indians and seek, under the guise of general regulations, to channel development elsewhere in the community. And even when local regulations are adopted in the best of faith, the differing economic situations of reservation Indians and the general citizenry may give the ordinance of equal application a vastly disproportionate impact.

Given the present Federal policies of fostering tribal self-government and economic self-development, we think an interpretation of P.L. 280 excluding local jurisdiction is mandated. The result, given the fact that Indians and surrounding communities are often likely to have differing views of the relative priority of economic development, environmental amenity, public morals,[14] and the like, is that there may inevitably be some abrasion between Indian communities and local neighbors. That, however, does not dictate eliminating Indian jurisdiction. The fact that Indians are involved in the squabble does not make the dispute unusual; precisely the same sort of conflicts often exist between non-Indian local communities with differing priorities. The remedy here, as there, is that when such conflicts involve a matter in which the state has a sufficient stake or interest to legislate, the state may, subject to the limitations of § 1360(b), pass a law of statewide application resolving the matter. And if the state is unable to act alone, it may seek Federal cooperation.

II. *Application of 25 C.F.R. § 1.4, and the "encumbrance" limitation*

Even assuming these County ordinances were "civil laws of such State or Territory that are of general application to private persons or private property" such that they would have application on the Rancheria under § 1360(a), nevertheless jurisdiction was not granted the County in this instance because the ordinances fall within exceptions enumerated in § 1360(b).

Section 1360(b) denies to the states the authority to regulate real property belong-

---

**14.** For instance, in *Rincon, supra,* it appears that the state permitted some forms of gambling, but permitted County regulation of the

matter, and that the County had passed an ordinance proscribing the Indians' activity.

ing to an Indian tribe held in trust by the United States in "a manner inconsistent with any Federal . . . statute or with any regulation made pursuant thereto . . . ." 25 C.F.R. § 1.4 provides:

"§ 1.4 State and local regulation of the use of Indian property.

"(a) Except as provided in paragraph (b) of this section, none of the laws, ordinances, codes, resolutions, rules or other regulations of any State or political subdivision thereof limiting, zoning or otherwise governing, regulating, or controlling the use or development of any real or personal property, including water rights, shall be applicable to any such property leased from or held or used under agreement with and belonging to any Indian or Indian tribe, band, or community that is held in trust by the United States

. . . .

"(b) The Secretary of the Interior or his authorized representative may in specific cases or in specific geographic areas adopt or make applicable to Indian lands all or any part of such laws, ordinances, codes, resolutions, rules or other regulations referred to in paragraph (a) of this section as he shall determine to be in the best interest of the Indian owner or owners in achieving the highest and best use of such property. . . ."

30 Fed.Reg. 7520 (June 9, 1965). The Secretary has adopted all California state zoning ordinances under this section but has explicitly chosen not "to adopt or make applicable" local ordinances. *See* 30 Fed.Reg. 8722. As Kings County's Zoning and Building Code ordinances are ordinances of a political subdivision "limiting, zoning or otherwise governing, regulating,

or controlling the use or development of . . . real . . . property. . . . ", County application of its ordinances to the Rancheria is barred by 25 C.F.R. § 1.4(a), and consequently the County is not authorized to exercise jurisdiction under P.L. 280.[15]

We are aware that several commentators have suggested that 25 C.F.R. § 1.4 is invalid because lacking in specific statutory authorization,[16] or because in derogation of the jurisdiction conferred by P.L. 280; and that at least two district courts have refused to apply its provisions for those reasons. *See Rincon Band, supra,* at 377–378; *Norvell v. Sangre de Cristo Development Company, Inc.,* 372 F.Supp. 348 (D.N.M.1974). We conclude that the regulation is valid.

■ Rule-making authority for the "management of all Indian affairs and of all matters arising out of Indian relations" is conferred by 25 U.S.C. § 2; 25 U.S.C. § 9 delegates rule-making authority to "effect the various provisions of any act relating to Indian affairs . . . ." It has been held that neither provision grants general regulatory powers to the Secretary of the Interior; to be valid a regulation must be reasonably related to some other specific statutory provision. *See Organized Village of Kake v. Egan, supra,* 369 U.S. at 63, 82 S.Ct. 562; United States Department of the Interior, Federal Indian Law 56–57 (1966); Cohen, Handbook of Federal Indian Law 102–103 (1945). We think 25 U.S.C. § 465, which authorizes the Secretary to purchase land for the "purpose of providing land for Indians" and to take the title to such lands in trust, when read against the history of Federal policy governing use and control of

**15.** As the County is without jurisdiction to enforce its ordinances, we voice no opinion on whether or not the Federal statutes providing housing and sanitation services evidence an intent to pre-empt County regulation of the housing provided here. The County regulations are inapplicable; the County has no jurisdiction to pre-empt. For the same reason, we voice no opinion on a similar ground relied on by the district court, that Federally authorized and funded construction projects on Federal land are exempt from local regulations which

burden the completion of the project. *See Arizona v. California,* 283 U.S. 423, 51 S.Ct. 522, 75 L.Ed. 1154 (1931); *City of Birmingham v. Thompson,* 200 F.2d 505, 509 (5th Cir. 1952); *United States v. City of Philadelphia,* 147 F.2d 291 (3d Cir. 1945); *United States v. City of Chester,* 144 F.2d 415 (3d Cir. 1944); *Oklahoma City v. Sanders,* 94 F.2d 323 (10th Cir. 1938).

**16.** *See Goldberg,* at 586 n. 229; *Price, supra,* at 290–293.

Indian trust property, is sufficient to sustain the regulation as it applies to the Rancheria lands, obtained pursuant to § 465.

Land held in trust for the benefit of Indians has long played the central role in Federal policy towards Indians. Cohen, *supra*, at 94. While the manner in which trust property is held and may be used has been in part defined by statute, a great many of the most significant incidents of the trust property relationship are not statutorily created, but rather a result of judicial definition. The doctrine of Federal ownership of Indian land stems from *Johnson & Graham's Lessee v. McIntosh*, 21 U.S. (8 Wheat.) 543, 5 L.Ed. 681 (1823), which held the general government obtained title through the right of discovery exercised by colonial predecessors. The rudiments of the wardship or trust status of Indian tribes was announced in *Cherokee Nation v. Georgia, supra*, 30 U.S. at 12—a consequence of Federal ownership of title to lands the Indians occupied. The exclusivity of Federal jurisdiction over trust lands, whether based on an ownership theory, *United States v. Kagama, supra*, or commerce clause theory, *Worcester v. Georgia, supra*, was likewise recognized by Court decision. Most importantly for our purposes here, the immunity of Indian use of trust property from state regulation, based on the notion that trust lands are a Federal instrumentality held to effect the Federal policy of Indian advance-

ment and may not therefore be burdened or interfered with by the state, is a product of judicial decision. *United States v. Rickert*, 188 U.S. 432, 23 S.Ct. 478, 47 L.Ed. 532 (1903). Each of these judicially defined characteristics of Indian trust property remained implicit in subsequent congressional enactments dealing with trust property.

■ The language used in § 465 must be read against this backdrop, which provides the implicit substance of what the language signifies. We are confident that when Congress in 1934 authorized the Secretary to purchase and hold title to lands for the purpose of providing land for Indians, it understood and intended such lands to be held in the legal manner and condition in which trust lands were held under the applicable court decisions—free of state regulation.[17]

■ In that light, the Secretary's regulation, insofar as it denies to the states the power to zone Federal trust property acquired under § 465,[18] reasonably implements the statute. The regulation simply expresses the Secretary's understanding of the prior law defining the conditions under which he holds the land acquired and under which the Indians may use the land provided for them, *see* 5 U.S.C. § 301; it is undoubtedly an accurate expression of the congressional understanding of the conditions under which it authorized acquisition of lands for Indian use.[19]

---

17. Section 465 explicitly exempted the lands acquired from state taxation. Rather than reading the omission of a provision exempting the lands from state regulation as evidencing a congressional intent to allow state regulation, we read the omission as indicating that Congress simply took it for granted that the states were without such power, and that an express provision was unnecessary; *i. e.*, that the exemption was implicit in the grant of trust lands under existing legal principles.

18. We leave open the question of the validity of the regulation insofar as it asserts the power of the Secretary *vis-a-vis* an Indian tribe to adopt state or local zoning ordinances on trust property.

19. We need not decide the validity of the regulation as applied to lands not acquired pursuant to § 465—the lands involved here were so ac-

quired. So far as we can discover, there is no general statute authorizing the holding of title to Indian lands in trust by the United States, as does § 465, or authorizing the Secretary of the Interior to administer trust lands. The first power is apparently an inherent incident of the judicially recognized ownership status; the second derives from the Secretary's 25 U.S.C. § 2 authority. We merely note that as the nature of the trust property relationship between the Federal government and the Indian tribes is rather uniquely a product of judicial decision rather than statute, and as Congress has implicitly acted on it and ratified it for so long, and as that relationship provides the central framework for "Indian relations," that this may be a situation in which the regulation is sustainable under 25 U.S.C. § 2 alone.

Moreover, in P.L. 280 states such as California, the regulation may be independently justified as an administrative interpretation of the word "encumbrance" in § 1360(b) itself, clarifying the scope of the jurisdiction over trust property granted the states. *See* text at n. 19 *infra*.

■ The question remains whether the regulation is in derogation of the grant of jurisdiction made by P.L. 280. Section 465 was passed in 1934, P.L. 280 in 1953, and the regulation was adopted in 1965. Despite changes in the doctrinal justifications underlying the immunity of trust lands from state supervision which occurred between 1934 and 1965, *see Williams v. Lee, supra*; *Warren Trading Post, supra*; *McClanahan, supra*, the substance of that immunity remained relatively unchanged. Whether one views it as a matter of exclusive Federal jurisdiction or Federal preemption, *see* n. 1 *supra*, absent a grant of jurisdiction states remained as unable to regulate trust lands in 1965 as they had been in 1934. Thus the regulation promulgated in 1965 accurately defined the conditions under which the trust property involved here was to be held and used, unless the intervening passage of P.L. 280 altered those conditions in mandatory P.L. 280 states such as California by giving the state power to zone trust property. We conclude that it did not.

■ P.L. 280 expressly disclaims authorizing state "encumbrance or taxation of any real . . . property . . . held in trust by the United States . . ." 28 U.S.C. § 1360(b). The word "encumbrance" is of course ambiguous, and courts have split on whether or not it evidences an intent to exempt trust lands from state zoning and land use regulations. *Compare Snohomish County v. Seattle Disposal Co.*, 70 Wash.2d 668, 425 P.2d 22 (1967), *cert. denied*, 389 U.S. 1016, 88 S.Ct. 585, 19 L.Ed.2d 662 (1967) (Douglas and White JJ., dissenting), *with Rincon Band, supra, and Agua Caliente Band of Mission Indians' Tribal Council v. City of Palm Springs*, 347 F.Supp. 42 (C.D.Cal.1972), *vacated and remanded* by this court in an unpublished order, January 24, 1975. *See* Hastings L.J. at 1496–1499; Goldberg, at 586–587; Price, *supra*, at 277–283. Relying on the canon of construction applied in favor of Indians, the Court has ruled in different contexts that the word "encumbrance" is to be broadly construed and is not limited to a burden which hinders alienation of the fee, *see Squire v. Capoeman, supra*; *Rickert, supra*; *Kirkwood v. Arenas*, 243 F.2d 863 (9th Cir. 1957), rather focussing on the effect the challenged state action would have on the value, use and enjoyment of the land. *See* Hastings L.J., at 1498–1499. *Compare* the majority and dissenting opinions in *Snohomish, supra*. Following the Court's lead, and resolving, as we must, doubts in favor of the Indians, we think that the word as used here may reasonably be interpreted to deny the state the power to apply zoning regulations to trust property.[20]

We have previously discussed the various reasons of policy and history for narrowly construing the grant of jurisdiction to exclude local government. In large part similar reasons are applicable here, and no purpose is served by extensive reiteration. Suffice it to say that application of state or local zoning regulations to Indian trust lands threatens the use and economic devel-

---

**20.** We need not decide the full dimensions of the "no encumbrance to trust property" exception, as we are certain in any event that the regulation's proscription of the local zoning ordinances involved here falls well within it, and is hence not in derogation of the statutory grant. Nevertheless, it has been suggested that the word "encumbrance" might be interpreted so broadly as to eliminate state regulation of all activity occurring on trust property. *See* Goldberg, at 587. We note that 25 C.F.R. § 1.4 is conceivably subject to the same objection. As we read "encumbrance," it is directed, consonant with the flavor of the word's narrow legal meaning, at traditional land use regulations and restrictions directed against the property itself, and does not encompass regulations of activity which only incidentally involve the property. *See Rincon, supra*, at 376–377. However, the full dimensions of the statutory exception, and the validity of 25 C.F.R. § 1.4 when asserted in other contexts as a bar to state jurisdiction, must await determination on a case-by-case basis.

opment of the main tribal resource—here it even handicaps the Indians in living on the reservation—and interferes with tribal government of the reservation. *See* Goldberg, at 587. Consequently, a construction of the term "encumbrance" more consonant with present congressional policy is mandated.[21]

As P.L. 280 may reasonably be construed not to grant P.L. 280 states the jurisdiction to zone trust lands, the Secretary's regulation does not contradict the statute; and as it is validly authorized and reasonable, the regulation is entitled to the force and effect of law. Thus, both as a consequence of the regulation, and, independently, of our construction of "encumbrance" in the statute itself, the local zoning ordinance and building code are inapplicable on the Rancheria.

### III. *Inconsistency with Federal statutes*

■ Finally, application of the ordinances in the circumstances presented here is inconsistent with the statutes authorizing the B.I.A. and I.H.S. to provide housing and sanitation aid to the plaintiffs. The H.I.P. was adopted pursuant to 25 U.S.C. § 13 and funded by P.L. 92–369. The I.H.S. services are provided under 42 U.S.C. § 2004a, using funds appropriated by P.L. 92–18. The purpose of both statutory programs is to upgrade the deplorable living conditions of many reservation Indians; funds are limited under both programs. Application of various local zoning and building ordinances rather than uniform Federal standards greatly enhances the difficulty of adminis-

tering the Federal programs, adds expense to already tight budgets, and ultimately detracts from the programs' goals. The fees charged here by the County directly impede the receipt of the Federal services. The Zoning Ordinance, which subjects the Federally provided housing to the discretionary administrative approval of a County official, and to use for a two-year limit, threatens altogether to prevent plaintiffs' use of the housing, and at the very least impedes its provision and use. And the Building Code, which requires permits for the provision of the I.H.S. services, likewise hinders the performance of the duties authorized by § 2004a. We are therefore clear that application of the County's ordinances here is "inconsistent" with the Federal statutes, and that, for this reason as well, the County is without jurisdiction to do so.

■ Finally, we turn to an issue which the parties have not urged but which we feel we must address—the breadth of the district court's judgment. In our opinion, paragraph 3(b) of the judgment entered is overbroad, going beyond the applicable principles outlined above and beyond the relief requested by plaintiffs. It not only enjoins enforcement of the particular County ordinances in issue which purport to regulate use of the Rancheria, but also prevents enforcement of any County ordinance, now or hereafter enacted, which incidentally "adds expense or inconvenience" to the maintenance "of housing facilities or

---

**21.** Two arguments have been advanced for defining "encumbrance" narrowly. We find neither persuasive. The first, advanced by the dissent in *Snohomish*, is that a broad construction leaves the state without police power to protect the safety of its other citizens living near reservations and was therefore not intended by Congress. The argument is essentially a make-weight—the states were without power to enforce land use restrictions against the reservation before the passage of P.L. 280 and are no worse off if the statute does not confer such authority. Basically the argument is an expression of the assumption that the statute was wholly assimilationist in all its parts, and therefore must be interpreted to give the states the same regulatory power over Indians as exercised over other citizens. *See Snohomish, su-*

*pra,* at 425 P.2d 27–29 (dissent). For reasons already stated, we do not share that assumption. The second argument, advanced in *Rincon, supra,* is that a broad reading of "encumbrance" to preclude application of zoning regulations to trust lands would render redundant the clause: ". . . [or] shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement or statute or with any regulation . . .." We disagree. As we read it, *see* n. 19 *supra,* "encumbrance" is narrower than the latter clause, precluding all regulations or restrictions attached directly to land use, whereas the latter clause encompasses all activity located on reservation land, permitting comprehensive state regulation except where pre-empted by or inconsistent with overriding Federal enactments.

appurtenances thereto" when funded by a federal agency—it might, for example, be interpreted (improperly, we think) to enjoin the County from charging Rancheria Indians the same fee for County-supplied water, for sanitation hookups, required of other County residents, or to require the County to otherwise discriminate in favor of the Indians. While controlling principles we have discussed above bar County regulation of Indian land by indirect subterfuges, they do not bar all incidental on-reservation consequences of County regulations. The court must determine on a case-by-case basis when concrete disputes arise whether the County has jurisdiction to enforce a particular ordinance under the applicable jurisdictional principles enunciated above.

Consequently, we vacate paragraph 3(b) of the district court's order and remand for the court to fashion a judgment consistent with all the fundamentals and on all the bases enunciated by this opinion (the presence of Federal funding is not a necessary condition to enjoining defendants' enforcement of County ordinances on trust land), but limited in its language and application to actual or reasonably anticipated grievances arising from disputed ordinances which purport to control what may or must be done on the Indian lands. On remand, the court should make further findings delineating the manner in which any particular County ordinance whose enforcement is enjoined has impermissibly intruded, or threatens to intrude, on Indian use of the Rancheria.

Affirmed in part; vacated and remanded in part.