Earl S. ATKINSON et al., Petitioners,

v.

George Edward HALDANE and Romey
Jones Williams, Respondents.

No. 2981.

Supreme Court of Alaska.

Sept. 16, 1977.

Steven S. Anderson, Ziontz, Pirtle, Morisset, Ernstoff & Chestnut, Seattle, Wash., for petitioners.

W. Clark Stump, Ketchikan, Stump & Stump, for respondents.

## OPINION

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, ERWIN and BURKE, JJ.

RABINOWITZ, Justice.

The case comes before us on a petition for review from the superior court's denial of petitioners' motion for summary judgment. This litigation involves the deaths of two Metlakatla Indians, Marilyn Alice Haldane and Romey Ervin Williams, residents of the Metlakatla Indian Community, resulting from injuries incurred in an automobile accident May 12, 1974, on the reservation. Their personal representatives filed suit in the superior court for the State of Alaska, at Ketchikan, against the Community of Metlakatla, certain Community officials, and four police officers employed by the Community. The complaint alleged that the defendant police officers recklessly and negligently operated their vehicle, thereby causing the accident from which the deaths resulted (count I); the police officers negligently failed to render aid and assistance to the victims of the accident (count II); the police officers conspired to violate the civil rights of the decedents, accorded pursuant to 25 U.S.C. §§ 1301–03, the Indian Civil Rights Act of 1968 (count III); and the defendant Community of Metlakatla and the defendant officials of the Community of Metlakatla negligently trained the police officers involved (counts I–III). The complaint also sought punitive damages (count IV). Jurisdiction was alleged pursuant to 28 U.S.C. § 1360(a) which provides, in relevant part:[1]

Each of the States or Territories listed in the following table shall have jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country listed opposite the name of the State or Territory to the same extent that such State or Territory has jurisdiction over other civil causes of action, and those civil laws of such State or Territory that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State or Territory:

| State or Territory of | Indian country affected |
|---|---|
| Alaska | All Indian country within the Territory |

Subsequent to the filing of the complaint, petitioners, defendants below, moved for summary judgment on the grounds that the complaint failed to state a claim upon which relief could be granted and the superior court lacked both subject matter and personal jurisdiction. The motion was grounded on the principles that the Indian tribes, as a matter of federal law, enjoy sovereign immunity from suit; jurisdiction under the Indian Civil Rights Act of 1968 was vested exclusively in the federal courts; and in any event, the claim of punitive damages should be dismissed as violative of public policy. The superior court, in denying the motion for summary judgment inso-

---

1. Jurisdiction was also asserted to lie under the provisions of AS 09.65.070 which provides, where relevant:

Suits against incorporated units of local government. (a) An action may be maintained against an incorporated borough, city, or other public corporation of like character in its corporate character and within the scope of its authority, or for an injury to the rights of the plaintiff arising from some act or omission of the unit of local government.

far as it was grounded on the doctrine of sovereign immunity, concluded that the courts of the State of Alaska have jurisdiction to hear this suit against the Metlakatla Indian Community by virtue of 28 U.S.C. § 1360(a) 1970, AS 09.55.580 and AS 09.65.-070.[2] The superior court further ruled that Alaska's courts do not have jurisdiction over claims brought pursuant to the Indian Civil Rights Act of 1968 and that this count of the complaint failed to state a claim upon which relief could be granted. The court also held there is no authority for an award of punitive damages. Petitioners moved for reconsideration on the basis of *Namekagon Development Co. v. Bois Forte Reservation Housing Authority,* 517 F.2d 508 (8th Cir. 1975), a case not previously brought to the attention of the superior court. That motion was denied. Petitioners moved a second time for reconsideration on the basis that the United States Supreme Court in *Bryan v. Itasca County,* 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976) had recently reversed a decision of the Minnesota Supreme Court on which the superior court relied in its denial of the sovereign immunity portion of the motion for summary judgment. The second motion for reconsideration was also denied. This petition for review followed.[3]

The first question we will address in this matter is whether the Metlakatla Indian Community possesses sovereign immunity from the subject wrongful death actions. The answer to this question requires that we initially discuss the historical background of the Metlakatla Indian Community, its status compared with that of other Alaska Native peoples, and the decisional law in the area of tribal sovereign immunity.

In 1887 approximately 800 Tsimshian Indians migrated from British Columbia to the Annette Islands, located in southeastern Alaska, and established the Metlakatla Indian Community. The move was prompted by disagreements with the Province of British Columbia and the Dominion of Canada with respect to treaties, land claims and self-government claims.[4] While in British Columbia, the Community had an organized tribal government which was similar to the traditional Tsimshian village council, but they had adopted certain changes in response to Christianity and the demands of William Duncan, the missionary to the group. The conflicts with the British Columbian government arose from the government's refusal to recognize native and aboriginal rights, its refusal to recognize the village council as a legitimate governing body and its laws as legitimate laws, and attempts by the government to place the Community under Canada's Indian Act and to appoint an Indian agent.

When negotiations with the British Columbia government reached an impasse, the Community planned the move to the Annette Islands in Alaska. Duncan was sent to Washington, D. C. to meet with officials in order to gain a land grant in Alaska. Encouraged by Duncan's discussions, the group moved to Alaska in 1887. A tribal government was established which passed bills, collected taxes, appointed police officers, carried out public works and looked after public safety. In 1891 Congress set aside the Annette Islands Reserve (Act of March 3, 1891, ch. 561 § 15, 26 Stat. 1101, 48 U.S.C. § 358)

> for the use of the Metlakahtla Indians . . . and such other Alaskan natives

---

2. AS 09.55.580 makes provision for wrongful death actions. AS 09.65.070 is set out in note 1, *supra.*

3. Respondents have not sought review of the superior court's ruling regarding the appropriate forum for claims brought under the Indian Civil Rights Act of 1968, or the superior court's determination that punitive damages were not recoverable.

4. This historical information and much of that which follows is taken from the affidavit of Barbara Lane which petitioners submitted below in support of their motion for summary judgment. Ms. Lane is an anthropologist, specializing in Northwest Coast Indian ethnology and ethnohistory. She was retained by the Metlakatla Indian Community to conduct research on the origins of the community regarding the tribe's claims of sovereignty before and after the creation of the reservation in 1891.

as may join them, to be held and used by them in common, under such rules and regulations, and subject to such restrictions, as may be prescribed from time to time by the Secretary of the Interior. The Alaska Native Claims Settlement Act, P.L. 92–203, 85 Stat. 688, 43 U.S.C. §§ 1601–27, revoked the other Alaskan Indian reserves which had been set aside, but specifically excepted the Annette Island Reserve. 43 U.S.C. § 1618(a).

On August 23, 1944, the Constitution and By-Laws of the Metlakatla Indian Community were approved by the Secretary of the Interior, pursuant to § 16 of the Indian Reorganization Act of 1934, 48 Stat. 987, 25 U.S.C. § 476; they were ratified by the Community on December 19, 1944. These documents established a local government system complete with provisions for a 12-member council and a judiciary. The magistrate was established as the chief judicial officer with power to levy fines not in excess of $360 for violations of ordinances passed by the council. The documents do not mention any waiver of sovereign immunity. The Community also adopted a corporate charter pursuant to § 17 of the Indian Reorganization Act of 1934, 48 Stat. 988, 25 U.S.C. § 477. That document contains a "sue and be sued" clause.

The interactions of the United States government and the Alaska Native peoples as a whole have been much different from those between the government and the tribes in the other states.[5] The first major difference stems from the fact that initially the Alaska Natives came under Russian rule. The Treaty of Cession,[6] in art. III, provided:

The inhabitants of the ceded territory, according to their choice, reserving their natural allegiance, may return to Russia within three years; but if they should prefer to remain in the ceded territory, they, with the exception of uncivilized native tribes, shall be admitted to the enjoyment of all the rights, advantages, and immunities of citizens of the United States, and shall be maintained and protected in the free enjoyment of their liberty, property, and religion. The uncivilized tribes will be subject to such laws and regulations as the United States may, from time to time, adopt in regard to the aboriginal tribes of that country.

Thus the difference was not between Native and white Alaskans, but rather between the "civilized" and "uncivilized" tribes.[7] A second distinction stems from the fact that in the early days of the territory, the land resources of Alaska seemed limitless; thus the parallel of the westward migration of white civilization which displaced the tribes never occurred in Alaska. This also provides a partial reason for the lack of reservations in Alaska.[8] Another difference lies in the fact that even though the purchase of the territory occurred in 1867, four years before the termination of the Senate's power to ratify treaties with the Indians, the government never attempted to enter into treaties with Alaskan Natives.[9]

The Metlakatlans share some of these listed differences with other Alaska Natives, yet in certain other respects they are an exception to the exception.[10] The Metlakatlans' reservation status sets them apart from other Alaska Natives,[11] making them

5. *See Metlakatla Indian Community v. Egan*, 369 U.S. 45, 50–51, 82 S.Ct. 552, 556–557, 7 L.Ed.2d 562, 567–68 (1962).

6. 15 Stat. 539. Ratified by the United States May 28, 1867, and proclaimed June 20, 1867.

7. For a discussion of this distinction see *In re Minook*, 2 Alaska 200 (1904). Of course, this distinction does not apply to the Metlakatlans, since they immigrated to Alaska after the Alaska Purchase.

8. Note that with respect to this factor, the Metlakatlans are the exception to the exception, the Annette Island Reserve having been established in 1891.

9. F. Cohen, Handbook of Federal Indian Law 405 (1942; second printing, Univ. New Mexico) [hereinafter cited as Cohen].

10. *Id.* at 415.

11. As noted earlier, the Alaska Native Claims Settlement Act, 43 U.S.C. §§ 1601–27, revoked

much more like the tribes of the other states. This status has had an effect on the assimilation of the Metlakatlans as well. The history of the Metlakatlans reveals a strong central tribal organization unlike most Alaska Native groups.[12] Given these differences, it is important to determine whether or not they mandate that we accord different treatment to the Metlakatlans than that given to tribes in other states. At this point we turn to the decisional law which deals with the Metlakatla Community.

In one of the leading cases dealing with the Metlakatla Community, *Metlakatla Indian Community v. Egan*, 369 U.S. 45, 82 S.Ct. 552, 7 L.Ed.2d 562 (1962), Justice Frankfurter reviewed the differences between the Indians of Alaska and the Indians of the other states. He stated:

The Indians of southeastern Alaska, who have very substantially adopted and been adopted by the white man's civilization, were never in the hostile and isolated position of many tribes in other States. As early as 1886 a federal judge, holding Alaskan Indians subject to the Thirteenth Amendment, denied that the principle of Indian national sovereignty enunciated in *Worcester v. Georgia* (US) 6 Pet. 515, 8 L.Ed. 483, applied to them. There were no Indian wars in Alaska, although on at least one occasion, there were fears of an uprising. There was never an attempt in Alaska to isolate Indians on reservations. Very few were ever created, and the purpose of these, in contrast to many in other States, was not to confine the Indi-

ans for the protection of the white settlers but to safeguard the Indians against exploitation. Alaskan Indians are now voting citizens, some of whom occupy prominent public office in the state government. Metlakatlans, the State tells us, have always paid state taxes, in contrast to the practice described and prescribed for other reservations in *The Kansas Indians*, and it has always been assumed that the reservation is subject to state laws.[13] (citations omitted)

Justice Frankfurter also noted the provision in the section reserving the Annette Islands which subjects the Metlakatlans to the rules, regulations and restrictions imposed by the Secretary of the Interior.[14] The Secretary had promulgated two series of regulations which the Court thought had a bearing on the issue before it. The first were regulations issued in 1915 which established local government powers and gave the Community's elective council authority to pass laws not in conflict with federal or territorial laws.[15] The second were regulations, also issued in 1915, authorizing the use of fish traps on the reserve.[16] The Supreme Court held that the federal authority reserved in the Act of March 3, 1891, precluded the assertion of the state's anti-fishtrap statute given the Secretary's regulation permitting fishtraps. Thus, although language in the case could be cited as authority for the proposition that the unique history of the Metlakatla Community mandates treatment different from that accorded to tribes in other states, the actual holding of the case reflects a supremacy notion, *i. e.*, the Secretary's regulation al-

the other limited reserves which had been made, but specifically exempted the Annette Island Reserve from its operation. 43 U.S.C. § 1618(a).

12. The Native villages and communities of Alaska were not organized on "tribal" lines, and the village rather than the ethnological tribe has been the central unit of organization. *See* Cohen, *supra* note 9, at 414 & n. 208.

13. *Metlakatla Indian Community v. Egan*, 369 U.S. 45, 50–51, 82 S.Ct. 552, 556–57, 7 L.Ed.2d 562, 567–68 (1962).

14. *See* 48 U.S.C. § 358 (1970).

15. *Metlakatla Indian Community v. Egan*, 369 U.S. at 53, 82 S.Ct. at 558, 7 L.Ed.2d at 569.

These regulations were contained in 25 C.F.R. §§ 1.2 *et seq.* (1939 ed.). They are no longer a part of C.F.R.

16. The regulations on this topic, as amended, promulgated after the *Metlakatla* case, are found in 25 C.F.R. §§ 88.1–.6 (1976).

lowing fishtraps preempts application of the state's law prohibiting fishtraps.[17]

We deem it significant that the primary distinction drawn by Justice Frankfurter between the Metlakatlans and other Alaska Natives in *Metlakatla Indian Community v. Egan* and its companion case, *Organized Village of Kake v. Egan*, 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962), is the existence of a reservation. He stated:

> But state regulation of off-reservation fishing certainly does not impinge on treaty-protected reservation self-government, the factor found decisive in *Williams v. Lee* [358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 25 (1959)]. Nor have appellants [in *Kake*] any fishing rights derived from federal laws. This Court has never held that States lack power to regulate the exercise of aboriginal Indian rights, such as claimed [in *Kake*], or of those based on occupancy.[18]

The history of the Metlakatlans was also examined by the United States Supreme Court in *Alaska Pacific Fisheries v. United States*, 248 U.S. 78, 39 S.Ct. 40, 63 L.Ed. 138 (1918). The case involved a suit by the United States to enjoin a California corporation from maintaining fishtraps in navigable waters in the Annette Islands. The Court held that the waters were part of the reservation established for the Metlakatlans and thus the injunction should be granted. The Court noted:

After their settlement and before the reservation was created, the Indians, under the guidance of a noted missionary, adopted a form of self-government suited to their needs; established for themselves a village with substantial dwellings, schoolhouses, and the like, and constructed and installed an extensive establishment where they canned salmon for the market.

The purpose of creating the reservation was to encourage, assist, and protect the Indians in their effort to train themselves to habits of industry, become self-sustaining, and advance to the ways of civilized life. True, the Metlakahtlans were foreign born, but the action of Congress had made that immaterial here.[19] (footnote omitted)

The Supreme Court thus held that the fact that the Metlakatlans were not native to the United States did not change their essential reservation status when Congress had exercised its authority to establish that reservation.

■ Thus, based on the foregoing, we conclude that the reservation status of the Metlakatla Indian Community sets them apart from other Alaska Natives and that the status of the Metlakatla Indian Community has always more closely resembled the status of the tribes in other states than the status of other Natives in Alaska.[20]

17. However, in a companion case, *Organized Village of Kake v. Egan*, 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962), the Supreme Court allowed the application of the state's anti-fishtrap law to Tlinget Indian communities. The Supreme Court said:

> The situation here differs from that of the Metlakatlans in that neither Kake nor Angoon has been provided with a reservation and in that there is no statutory authority under which the Secretary of the Interior might permit either to operate fish traps contrary to state law.

369 U.S. at 62, 82 S.Ct. at 564, 7 L.Ed.2d at 576.

18. *Organized Village of Kake v. Egan*, 369 U.S. 60, 75, 82 S.Ct. 562, 571, 7 L.Ed.2d 573, 584 (1962).

19. 248 U.S. at 88–89, 39 S.Ct. at 42, 63 L.Ed. at 141.

20. Whether Alaska Natives should be accorded the same treatment as other tribes has been debated for some time. Felix Cohen, a noted scholar on Indian law, stated:

> The legal position of the individual Alaskan natives has been generally assimilated to that of the Indians in the United States. It is now substantially established that they occupy the same relation to the Federal Government as do the Indians residing in the United States; that they, their property, and their affairs are under the protection of the Federal Government; that Congress may enact such legislation as it deems fit for their benefit and protection; and that the laws of the United States with respect to the Indians resident within the boundaries of the United States proper are generally applicable to the Alaskan natives.

> * * * *

> The placing of the Alaskan natives on the same footing as other American Indians was

This brings us to the subject of tribal sovereign immunity. The tribal sovereignty of Indians was first recognized in *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 557, 8 L.Ed. 483, 499 (1832), in which Chief Justice Marshall stated that the Indian nations were

> distinct political communities, having territorial boundaries, within which their authority is exclusive, and having a right to all the lands within those boundaries, which is not only acknowledged, but guaranteed by the United States.[21]

One of the leading decisions in the area of tribal sovereign immunity is *United States v. United States Fidelity & Guaranty Co.*, 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940). The question before the Supreme

the culmination of a shifting policy which has been well described in an opinion of the Solicitor for the Department of the Interior:

> In the beginning, and for a long time after the cession of this Territory Congress took no particular notice of these natives; has never undertaken to hamper their individual movements; confine them to a locality or reservation, or to place them under the immediate control of its officers, as has been the case with the American Indians; and no special provision was made for their support and education until comparatively recently. And in the earlier days it was repeatedly held by the courts and the Attorney General that these natives did not bear the same relation to our Government, in many respects, that was borne by the American Indians.
>
> With the exception of the act of March 3, 1891 (26 Stat. 1095, 1101), which set apart the Annette Islands as a reservation for the use of the Metlakahtlans, a band of British Columbian natives who immigrated into Alaska in a body, and also except the authorization given to the Secretary of the Interior to make reservations for landing places for the canoes and boats of the natives, Congress has not created or directly authorized the creation of reservations of any other character for them.
>
> Later, however, Congress began to directly recognize these natives as being, to a very considerable extent at least, under our Government's guardianship and enacted laws which protected them in the possession of the lands they occupied; made provision for the allotment of lands to them in severalty, similar to those made to the American Indians; gave them special hunting, fishing and other particular privileges to enable them to support themselves, and supplied them with reindeer and instructions as to their propagation. Congress has also supplied funds to give these natives medical and hospital treatment and finally made and is still making extensive appropriations to defray the expenses of both their education and *their support*.
>
> Not only has Congress in this manner treated these natives as being wards of the Government but they have been repeatedly so recognized by the courts.
>
> From this it will be seen that these natives are now unquestionably considered and treated as being under the guardianship and protection of the Federal Government, at least to such an extent as to bring them within the spirit, if not within the exact letter, of the laws relative to American Indians; and this conclusion is supported by the fact that in creating the territorial government of Alaska and vesting that territory with the powers of legislation and control over its internal affairs, including public schools, Congress expressly excluded from that legislation and control the schools maintained for the natives and declared that such schools should continue to remain under the control of the Secretary of the Interior.
>
> An explanation of the reasons for this changing policy will be helpful in understanding the legal position of the Alaskan natives. The United States at first followed the example of Russia. From 1867 to 1884, when the Organic Act of 1884 made Alaska a civil and judicial district, this vast land had hardly the shadow of a civil government and was little more than a geographical subdivision of the United States. Save for the occasional activity of the military authorities, the natives shifted for themselves. This neglect is indicated by the failure of the United States to provide a regular agent for them, as in the case of Indians generally. The responsible duties of such an official were delegated to a military commandant. (footnotes and citations omitted; emphasis in original)

Cohen, *supra* note 9, at 404–05.

**21.** This statement by Marshall is often cited in the opinions in this area. Whether the principle cited therein remains inviolate is difficult to determine. For example, it is cited with approval and without qualification in *McClanahan v. Arizona Tax Comm'n*, 411 U.S. 164, 168, 93 S.Ct. 1257, 1260, 36 L.Ed.2d 129, 133 (1973). Yet in the companion case decided the same day, *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114, 119 the Court states:

> The conceptual clarity of Mr. Chief Justice Marshall's view in *Worcester v. Georgia* has given way to more individualized treatment of particular treaties and specific federal statutes . . . (citations omitted)

*In re Sah Quah*, 31 F. 327 (D. Alaska 1886), refused to apply the principles enunciated in *Worcester v. Georgia* to the Indian tribes of

Court in *U. S. Fidelity* related to the jurisdiction of a federal court to enter judgment on a cross-claim against an Indian tribe. The United States, as trustee for the Choctaw and Chickasaw Nations, had leased coal land to the Kansas and Texas Coal Company. U.S. Fidelity was surety on a bond guaranteeing payment of the lease royalties. The substituted lessee of the Kansas and Texas Coal Company went into receivership and the United States filed a claim for royalties. The lessee denied owing any royalties and cross-claimed for an amount over $11,000. In the reorganization proceedings, the federal court allowed the $2,000 claim of the Indians and the $11,000 cross-claim of the coal company. No appeal was taken from this judgment. However, prior to the entry of that judgment, the United States filed suit against the surety who, after entry of the judgment, pleaded the earlier judgment as a bar to recovery by the United States. The Court held that to the extent the cross-claimed amount exceeded recoupment, the judgment was void. The Supreme Court stated:

> We are of the view, however, that the Missouri judgment is void in so far as it undertakes to fix a credit against the Indian Nations. In *United States v. Shaw*, 309 U.S. 495, 60 S.Ct. 659, 84 L.Ed. 461 we hold [*sic*] that cross-claims against the United States are justiciable only in those courts where Congress has consented to their consideration. Proceedings upon them are governed by the same rules as direct suits. In the Missouri proceedings in corporate reorganization, the United States, by the Superintendent of the Five Civilized Tribes for the Choctaw and Chickasaw Nations, filed a claim on behalf of the Indian Nations. This it is authorized to do. No statutory authority granted jurisdiction

to the Missouri Court to adjudicate a cross-claim against the United States. The public policy which exempted the dependent as well as the dominant sovereignties from suit without consent continues this immunity even after dissolution of the tribal government. These Indian Nations are exempt from suit without congressional authorization. It is as though the immunity which was theirs as sovereigns passed to the United States for their benefit, as their tribal properties did. Possessing this immunity from direct suit, we are of the opinion it possesses a similar immunity from cross-suits. This seems necessarily to follow if the public policy which protects a quasi-sovereignty from judicial attack is to be made effective. . . . The sovereignty possessing immunity should not be compelled to defend against cross-actions away from its own territory or in courts, not of its own choice, merely because its debtor was unavailable except outside the jurisdiction of the sovereign's consent. This reasoning is particularly applicable to Indian Nations with their unusual governmental organization and peculiar problems.[22] (footnotes omitted)

The Supreme Court does not discuss why "[t]hese Indian Nations are exempt from suit without congressional authorization," but the opinion cites *Turner v. United States*, 248 U.S. 354, 39 S.Ct. 109, 63 L.Ed. 291 (1919); *Adams v. Murphy*, 165 F. 304 (8th Cir. 1908); and *Thebo v. Choctaw Tribe of Indians*, 66 F. 372 (8th Cir. 1895), in support of that statement.

*Turner* involved an action by a non-Indian who had formed an organization in conjunction with 100 Creek Indians to open a pasture using the Indians' reservation grazing rights. A fence was built despite dis-

---

Alaska on the basis that the Alaskan tribes were different from other Indians and had been accorded different treatment by the United States government. This decision of the federal court was not directly on the question of tribal sovereignty, but rather dealt with the question of slavery practices followed by the Alaskan tribes. In light of the court's recita-

tion of atrocities attributed to the Indian masters, it is not surprising that the district court decided that the 13th Amendment was equally applicable to the Alaskan tribes.

**22.** *United States v. United States Fidelity & Guar. Co.*, 309 U.S. 506, 512, 60 S.Ct. 653, 656, 84 L.Ed. 894, 898–99 (1940).

satisfaction within the neighborhood and threats by Indians to destroy it. When it was nearly completed three bands of Creeks destroyed it. Approximately fifteen years later, the tribal organization was dissolved pursuant to congressional action. Two years after the dissolution, Congress provided in § 26 of the Act of May 29, 1906:

> That the court of claims is hereby authorized to consider and adjudicate and render judgment as law and equity may require in the matter of the claim of Clarence W. Turner, of Muskogee, Oklahoma, against the Creek Nation, for the destruction of personal property and the value of the loss of the pasture of the said Turner, or his assigns, by the action of any of the responsible Creek authorities, or with their cognizance and acquiescence, either party to said cause in the court of claims to have the right of appeal to the Supreme Court of the United States.[23]

Turner filed in the Court of Claims to recover money he allegedly lost; the Court of Claims dismissed the case and Turner appealed to the Supreme Court. Justice Brandeis, writing for the Court, held that Turner was not entitled to recovery. Part of the Court's reasoning was that the Creek Nation was not liable as a matter of general law. Two considerations shaped the Court's conclusion, first, sovereign immunity, and second, the lack of a claim for relief for failure of a government to keep the peace. The Supreme Court stated:

The Creek Nation was recognized by the United States as a distinct political community, with which it made treaties, and which, within its own territory, administered its internal affairs. Like other governments, municipal as well as state, the Creek Nation was free from liability for injuries to persons or property due to mob violence or failure to keep the peace. Such liability is frequently imposed by statute upon cities and counties; but neither Congress nor the Creek Nation had dealt with the subject by any legislation prior to 1908. The fundamental obstacle to recovery is not the immunity of a sovereign to suit, but the lack of a substantive right to recover the damages resulting from failure of a government or its officers to keep the peace. And the participation in the injuries of an officer acting not *colore officii*, but in open and known violation of the law, cannot alter the case. The claimant's contention that the defendant owed to the claimant, as its own grantee, a greater duty than it owed to other persons in the territory, to protect him against mob violence, finds no support in reason or authority.[24] (citations omitted)

*Thebo v. Choctaw Tribe of Indians* involved a suit by a former tribal attorney against the tribe for attorney's fees. The Tribe asserted that the court lacked both personal and subject matter jurisdiction. The *Thebo* court recognized that it was

---

**23.** *Turner v. United States*, 248 U.S. 354, 356–57, 39 S.Ct. 109, 110, 63 L.Ed. 291, 293 (1919).

**24.** *Id.* at 358, 39 S.Ct. at 110, 63 L.Ed. at 294. *Adams v. Murphy*, 165 F. 304 (8th Cir. 1908), involved a suit by the previously employed attorney for the Creek Nation on his contract of employment. The attorney sued for equitable relief. The court noted that "the Creek Nation is exempt from civil suit to compel performance of its contracts or to recover damages for their violation." The court reasoned:

> Upon considerations of public policy such Indian tribes are exempt from civil suit. That has been the settled doctrine of the government from the beginning. If any other course were adopted the tribes would soon be overwhelmed with civil litigation and judgments. The civilized nations in the Indian Territory . . . are probably better

guarded against oppression from this source than the states themselves, under the eleventh amendment of the Constitution; for the states may consent to be sued, but the United States has never given its permission that these Indian nations might be sued generally, even with their consent.

165 F. at 308–09. The court held that a suit in equity would not lie against the Creek Nation. Sovereign immunity as recognized in *Adams* does not stem from the treaty status of the Creeks, or a provision in an agreement granting them rights of self-government, but rather, it stems from the perceived "disastrous consequences" that would result from widespread exposure to civil suit. Thus, sovereign immunity, as recognized by the *Adams* court, is a direct result of federal public policy.

within the power of Congress to authorize suit against the tribes, but noted that "no court has ever presumed to take jurisdiction of a claim against any of the five civilized Nations in the Indian Territory in the absence of an act of congress expressly conferring the jurisdiction in the particular case."[25] The *Thebo* court further relied on the fact that in exercise of its plenary powers over the Indians, Congress had not chosen to authorize suits against the tribes. The court stated:

> Being a domestic and dependent state, the United States may authorize suit to be brought against it. But, for obvious reasons, this power has been sparingly exercised. It has been the settled policy of the United States not to authorize such suits except in a few cases, where the subject-matter of the controversy was particularly specified, and was of such a nature that the public interests, as well as the interests of the Nation, seemed to require the exercise of the jurisdiction. It has been the policy of the United States to place and maintain the Choctaw Nation and the other civilized Indian Nations in the Indian Territory, so far as relates to suits against them, on the plane of independent states.[26]

The court further concluded:

> It has been the settled policy of congress not to sanction suits generally against these Indian Nations, or subject them to suits upon contracts or other causes of action at the instance of private parties. In respect to their liability to be sued by individuals, except in the few cases we have mentioned, they have been placed by the United States, substantially, on the plane occupied by the states under

the eleventh amendment to the constitution. The civilized Nations in the Indian Territory are probably better guarded against oppression from this source than the states themselves, for the states may consent to be sued, but the United States has never given its permission that these Indian Nations might be sued generally, even with their consent. As rich as the Choctaw Nation is said to be in lands and money, it would soon be impoverished if it was subject to the jurisdiction of the courts, and required to respond to all the demands which private parties chose to prefer against it. The intention of congress to confer such a jurisdiction upon any court would have to be expressed in plain and unambiguous terms.[27]

Thus, although *U. S. Fidelity, Turner, Adams* and *Thebo* do not, in our view, explore the basis of tribal sovereign immunity; they deal with the public policy reasons underlying congressional decisions not to waive it. However, in *U. S. Fidelity* it is stated that "[i]t is as though the immunity which was theirs as sovereigns passed to the United States for their benefit, as their tribal properties did."[28] We do not read this statement as a denial of sovereign immunity to any tribe who did not yield property to the United States. Rather, we think it advances the principle of allowing formerly self-governing units brought within the sovereign powers of the United States to retain some vestiges of that sovereignty until the greater sovereign decides that discontinuance of that vestige is in the interests of public policy.

Later cases do not shed much more light on the source of tribal sovereign immunity.[29] Of these cases *Haile v. Sau-*

---

**25.** *Thebo v. Choctaw Tribe of Indians,* 66 F. 372, 374 (8th Cir. 1895).

**26.** *Id.* at 375.

**27.** *Id.* at 376. *Thebo* has been generally cited for the proposition that Indian tribes are immune from suit without authorization from Congress. *See, e. g., Hamilton v. Nakai,* 453 F.2d 152, 158 (9th Cir. 1972); *Morgan v. Colorado River Indian Tribe,* 103 Ariz. 425, 443 P.2d 421, 423 (1968).

**28.** 309 U.S. at 512–13, 60 S.Ct. at 656, 84 L.Ed. at 899.

**29.** *See, e. g., Cherokee Nation v. Oklahoma,* 461 F.2d 674, 682 (10th Cir. 1972); *Hamilton v. Nakai,* 453 F.2d 152, 158 (9th Cir. 1972); *Twin Cities Chippewa Tribal Council v. Minnesota Chippewa Tribe,* 370 F.2d 529 (8th Cir. 1967); *Maryland Cas. Co. v. Citizens Nat'l Bank,* 361 F.2d 517 (5th Cir. 1966); *Green v. Wilson,* 331 F.2d 769 (9th Cir. 1964); *Dicke v. Cheyenne-Arapaho Tribes, Inc.,* 304 F.2d 113 (10th Cir.

*nooke*, 246 F.2d 293 (4th Cir. 1957), is the most germane to the instant case. There, plaintiffs sued the individual Indian proprietors of a tourist attraction, the Eastern Band of Cherokee Indians, and the United States in its official governmental capacity and as trustee for the Indians, for personal injuries sustained when a swinging bridge collapsed. The injuries occurred on the Cherokee Reservation. The Court of Appeals affirmed the lower court's dismissal of the suit against the Eastern Band of Cherokee Indians and the United States as trustee. The court traced the history of the Eastern Band [30] through the time, after 1835, when their connection with the Cherokee Nation was severed until their recognition as a tribe by congressional act in 1868. The court pointed to the guardianship that the United States had exercised over the Band and reaffirmed its prior holdings that the facts that the Band had lost their tribal lands, had separated from their tribe and had been subjected to the laws of North Carolina had not destroyed the right or the duty of guardianship. Thus, the court reaffirmed that the Eastern Band was an Indian tribe within the meaning of the Constitution and laws of the United States. Having thus found tribal status, the court stated:

The rule that a tribe of Indians under the tutelage of the United States is not subject to suit without the consent of Congress is too well settled to admit of argument.[31]

From this analysis in *Haile*, it is clear that the court was looking to tribal status as recognized by the executive branch of government as a sole condition precedent to judicial recognition of tribal sovereign immunity. The Band's tribal property had been lost. They had been separated from the claim to sovereignty of the Cherokee Nation. They were even a North Carolina corporate entity. Yet, since the government recognized the Band as a "tribe," the court ruled in favor of sovereign immunity.[32]

The doctrine of tribal sovereign immunity was most recently reaffirmed by the United States Supreme Court in *Puyallup Tribe, Inc. v. Department of Game*, —— U.S. ——, 97 S.Ct. 2616, 53 L.Ed.2d 667 (June 23, 1977). In that case, the Court held that the on-reservation netting of steelhead salmon by individual members of the Puyallup Tribe could be regulated by the State of Washington. Nevertheless, the Court vacated those portions of the state court order which involved relief against the Tribe itself. With reference to the Tribe's attack on the order as an infringe-

1962); *Salamanca v. Seneca Nation of Indians*, 47 F.Supp. 939 (W.D.N.Y.1942); *White Mountain Apache Indian Tribe v. Shelley*, 107 Ariz. 4, 480 P.2d 654 (1971); *Morgan v. Colorado River Indian Tribe*, 103 Ariz. 425, 443 P.2d 421 (Ariz.1968); and *Employment Security Dept. v. Cheyenne River Sioux Tribe*, 80 S.D. 79, 119 N.W.2d 285 (1963).

30. In 1817 the Cherokee Nation was divided into two bodies, one which remained east of the Mississippi and the other which resettled along the Arkansas and White Rivers. Cohen, *supra* note 9, at 53–54 n. 343.

After Jackson was elected president in 1828, he made it clear that the Indians must move west. Georgia enacted the harassing laws which were the subject of *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 8 L.Ed. 25 (1831), and *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832). After numerous attempts to coerce the tribe into moving west, the New Echota Treaty of 1835 was signed. This treaty ceded all Cherokee land east of the Mississippi. It also provided reservations of 160 acres for

those who wanted to remain in the East. Those who chose to remain dissolved their connection with the Cherokee Nation, but were not made citizens of the United States or North Carolina. Cohen, *supra* note 9, at 54–56.

31. *Haile v. Saunooke*, 246 F.2d 293, 297 (4th Cir. 1957). The court also noted that the Supreme Court of North Carolina had held that the Eastern Band of Cherokee Indians was immune from suit in *Rollins v. Eastern Band of Cherokee Indians*, 87 N.C. 229.

32. We note that the question of Indian sovereignty is one in which the commentators find vast areas of disagreement. *Compare* Martone, *American Indian Tribal Self-Government in the Federal System: Inherent Right or Congressional License?*, 51 Notre Dame Law. 600 (1976), *with* Israel & Smithson, *Indian Taxation, Tribal Sovereignty and Economic Development*, 49 N.Dak.L.Rev. 267 (1973), *and* Johnson, *Sovereignty, Citizenship and the Indian*, 15 Ariz.L.Rev. 773 (1973).

ment on its sovereign immunity, the Court noted:

> The attack is well founded. Absent an effective waiver or consent, it is settled that a state court may not exercise jurisdiction over a recognized Indian tribe. This Court, the Washington Supreme Court, and the commentators all concur. [The Department of Game] does not argue that either the Tribe or Congress has waived its claim of immunity or consented to the entry of an order against it. And certainly, the mere fact that the Tribe has appeared on behalf of its individual members does not effect a waiver of sovereign immunity for the Tribe itself.

—— U.S. at ——, 97 S.Ct. at 2621, 53 L.Ed.2d at 674. Thus, the doctrine of tribal sovereign immunity continues to be recognized by the Supreme Court of the United States.

In light of the historical background of the Metlakatla Community and the decisional law previously discussed, we find it difficult to discern any policy basis for concluding that the Metlakatla Indian Community should not be afforded such sovereign immunity as tribes in the other states enjoy. Additionally, we think there is merit in petitioners' further argument that what is at issue here is essentially a political question and that this court should adhere to the principle that political questions are not justiciable.[33] Given the applicability of this principle, petitioners further argue that the Metlakatla Indian Community has been recognized by the federal government as an organized tribe and thus should be given the protections accorded other tribes. More particularly, they ask application of the principle that tribes under the tutelage of the United States are immune from suit in the absence of congressional consent. In *United States v. Holliday*, 70 U.S. (3 Wall.) 407, 419, 18 L.Ed. 182, 186 (1866), the Su-

preme Court first declared the recognition of tribal status a political question. The Court stated:

> The facts in the case certified up with the division of opinion, show distinctly 'that the Secretary of the Interior and the Commissioner of Indian Affairs have decided that it is necessary, in order to carry into effect the provisions of said treaty, that the tribal organization should be preserved.' In reference to all matters of this kind, it is the rule of this court to follow the action of the executive and other political departments of the government, whose more special duty it is to determine such affairs. If by them those Indians are recognized as a tribe, this court must do the same.

This principle was reaffirmed by the Court in *United States v. Sandoval*, 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107 (1913), where it was stated:

> Of course, it is not meant by this [the statement in *Marchie Tiger v. Western Invest. Co.*, 221 U.S. 286, 315, 31 S.Ct. 578, 55 L.Ed. 738, 749, that tribal status is a political question] that Congress may bring a community or body of people within the range of this power by arbitrarily calling them an Indian tribe, but only that in respect of distinctly Indian communities the questions whether, to what extent, and for what time they shall be recognized and dealt with as dependent tribes requiring the guardianship and protection of the United States are to be determined by Congress, and not the courts.[34]

■ Thus, we conclude that the Metlakatla Indian Community, despite its unique history, is entitled to sovereign immunity. The fact that the Community came to the Territory of Alaska from British Columbia is not a significant factor.[35] The Community has been recognized by the United States government as an Indian tribe and has been

---

**33.** *See Baker v. Carr*, 369 U.S. 186, 215–17, 82 S.Ct. 691, 709–10, 7 L.Ed.2d 663, 684–86 (1962).

**34.** 231 U.S. at 46, 34 S.Ct. at 6, 58 L.Ed. at 114. *See also United States v. Washington*, 384 F.Supp. 312, 400 (W.D.Wash.1974).

**35.** *Alaska Pacific Fisheries v. United States*, 248 U.S. 78, 89, 39 S.Ct. 40, 41, 63 L.Ed. 138, 141 (1918).

treated accordingly. Once the executive branch has determined that the Metlakatla Indian Community is an Indian tribe, which is a nonjusticiable political question, the Community is entitled to all of the benefits of tribal status. The Supreme Court of the United States declared in *U. S. Fidelity* that one of those benefits is tribal sovereign immunity in the absence of congressional waiver. Court decisions from *United States v. Kagama*, 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 (1886) to *McClanahan v. State Tax Commission*, 411 U.S. 164, 170–72, 93 S.Ct. 1257, 1261–62, 36 L.Ed.2d 129, 134–36 (1973) have firmly established plenary congressional power over Indian affairs. Article VI, clause 2 of the United States Constitution provides:

> This Constitution, and the laws of the United States which shall be made in Pursuance thereof; and all treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or laws of any State to the Contrary notwithstanding.

The supremacy of the decisions of the Supreme Court of the United States has been recognized since *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 4 L.Ed. 97 (1816). Because of the supremacy of federal law, we are bound to recognize the doctrine of tribal sovereign immunity, even if we were to find valid public policy reasons to hold it inapplicable in this case. In our view the dissenting opinion of Chief Justice Boochever overlooks this supremacy doctrine. Chief Justice Boochever reasons by analogy from the Indian Civil Rights Act, 25 U.S.C. §§ 1301–03, that tort actions should be allowed against tribes. Whether or not such

actions *should* be allowed is not a question for us to decide; it is a question reserved to the plenary powers of Congress. Unless there has been a valid waiver of that immunity, we are obliged to hold that the Community is immune from suit.

The foregoing conclusions necessitate that we address the respondents' argument that 28 U.S.C. § 1360(a) is a waiver of sovereign immunity.[36] Since we must interpret this statute in order to determine whether it is a waiver of the sovereign immunity of the Metlakatla Indian Community, we deem it appropriate to discuss the historical context in which P.L. 83–280 (28 U.S.C. § 1360 and 18 U.S.C. § 1162) was enacted. Current issues in Indian law, including the interpretation of P.L. 83–280, should be viewed in the historical context of the vacillation of federal policy between total assimilation and preservation of Indian cultures.[37] This polarity in federal policy has contributed greatly to the confusion in the judicial treatment of the tribes and has inspired many of the theories and canons of construction used by the courts.

At the time of the Revolutionary War and the writing of the Constitution, the Indians were regarded as a serious threat to the existence of the new country. In *The Federalist* the Indians are regarded as "natural enemies" of the United States, a "danger" mandating a strong national government or generally a "threat to the union."[38] Among the first laws passed by Congress in the area of Indian affairs were the Indian Intercourse (or Non-Intercourse) Acts.[39] These Acts were basically non-assimilationist and controlled dealings between Indians and whites.

The pro-assimilationist change in federal policy came to ultimate fruition in the Dawes Act, the Act of February 8, 1887,

---

**36.** The text of 28 U.S.C. § 1360(a) is quoted at the outset of this opinion.

**37.** *See* Note, *State Taxation of Indians—Federal Preemption of Taxation Against the Backdrop of Indian Sovereignty*, 49 Wash.L.Rev. 191 (1973).

**38.** Martone, *American Indian Tribal Self-Government in the Federal System: Inherent*

*Right or Congressional License?*, 51 Notre Dame Law. 600, 604 (1976). *See* Johnson, *Sovereignty, Citizenship and the Indian*, 15 Ariz.L. Rev. 773, 985 (1973).

**39.** *E. g.*, Non-Intercourse Act of 1790, 1 Stat. 137; Intercourse Act of 1793, 1 Stat. 329; Indian Intercourse Act of 1834, 4 Stat. 729.

which provided farm-sized allotments for each individual tribal Indian.[40] All tribal land beyond that needed for these allotments was to be opened for non-Indian settlement. The assimilationist movement's desire was to bring the Indian into the full panoply of white civilization.[41] Since one of the basic differences in the cultures lay in private property concepts, the general allotment system seemed to be an ideal way to end the importance of tribal life and assimilate the Indian into white civilization.[42] The major consequence of the Dawes Act was loss of Indian lands.[43]

The allotment system and the assimilationist movement were gradually discredited, and in 1934 Congress terminated the allotment system and enacted the Indian Reorganization Act (Wheeler-Howard Act).[44] The Act was aimed primarily at strengthening the tribal governments.[45] During the two-year period in which the tribes could either accept or reject the Act's provisions, 181 tribes accepted the Act and 77 rejected it.[46]

The next revision of federal policy came in the early 1950's with the passage of P.L. 83–280 in 1953 and a federal policy of termination.[47] There is no question that the termination acts were assimilationist in nature, however some commentators argue that P.L. 83–280 is not. Professor Goldberg, who embraces the latter view, states:

> Passed in 1953, PL–280 was an attempt at compromise between wholly abandoning the Indians to the states and maintaining them as federally protected wards, subject only to federal or tribal jurisdiction.[48]

The last major congressional statement came with the passage of the Indian Civil Rights Act of 1968.[49]

P.L. 83–280 began as an attempt by the State of California to extend its criminal jurisdiction to all Indian country within the state.[50] It was decided in committee that

> any legislation in this area should be on a general basis, making provision for all affected States to come within its terms; that the attitude of the various States and the Indian groups within those States on the jurisdiction transfer question should be heavily weighed before effecting transfer; and that any recommended legislation should retain application of Indian tribal customs and ordinances to civil transactions among the Indians, insofar as these customs or ordinances are not inconsistent with applicable State laws.[51]

---

**40.** 24 Stat. 388, *as amended*, 25 U.S.C. §§ 331–34, 339, 341–42, 348–49, 381 (1970). The Act is also known as the General Allotment Act.

**41.** It is interesting to note that the grant of *reservation* status to the Metlakatla Indian Community in 1891 came at the height of pro-assimilationist sentiment.

**42.** *See* Cohen, *supra* note 9, at 208.

**43.** Indian landholdings went from 138 million acres in 1887 to 48 million acres in 1934. However, more importantly most of the land lost was the most valuable land. It is estimated that over 85% of the land value of Indian land holdings was lost. *Id.* at 216.

**44.** For a history of the Act, see Comment, *Tribal Self-Government and the Indian Reorganization Act of 1934*, 70 Mich.L.Rev. 955 (1972) [hereinafter cited as *Tribal Self-Government*].

**45.** *See* Canby, *Civil Jurisdiction and the Indian Reservation*, 1973 Utah L.Rev. 206, 211.

**46.** *Tribal Self-Government, supra* note 44, at 972.

**47.** Termination is the ending of the special relationship between the federal government and the Indian tribes. For a discussion of some of the termination acts, see *Bryan v. Itasca County*, 426 U.S. 373, 389–90, 96 S.Ct. 2102, 2111–12, 48 L.Ed.2d 710, 721–22 (1976).

**48.** Goldberg, *Public Law 280: The Limits of State Jurisdiction over Reservation Indians*, 22 U.C.L.A.L.Rev. 535, 537, 96 S.Ct. at 2110–11 (1975). *Accord, Bryan v. Itasca County*, 426 U.S. at 387–88, 48 L.Ed.2d at 720.

**49.** The full impact of this Act on tribal government has probably not yet been felt. *See generally* Comment, *The Indian Bill of Rights and the Constitutional Status of Tribal Governments*, 82 Harv.L.Rev. 1343 (1969).

**50.** H.R.Rep. No. 848, 83d Cong., 1st Sess., 1953 U.S.Code Cong. and Adm.News 2409, 2411.

**51.** *Id.* at 2412.

The extension of state criminal jurisdiction was the primary thrust of the legislation; the civil section was added without a great deal of discussion. Professor Goldberg states:

> There is much less evidence of the congressional rationale for conferring civil jurisdiction on the states, and much less factual support for that decision. State civil jurisdiction over reservation Indians was believed to have been somewhat more extensive than state criminal jurisdiction, though typically, state courts were powerless to resolve claims against reservation Indians arising on the reservation. Since federal law governed many important civil relations involving Indians, the B.I.A., charged with administering these laws, played a considerable governing role on the reservations.[52] (footnotes omitted)

Although the legislative history is rather sparce and not particularly helpful, it appears that the civil jurisdiction section was added because it was consistent with the pro-assimilationist federal policies formulated at that time.[53] The House Report states:

> Similarly, the Indians of several States have reached a stage of acculturation and development that makes desirable extension of State civil jurisdiction to the Indian country within their borders. Permitting the State courts to adjudicate civil controversies arising on Indian reservations, and to extend to those reservations the substantive civil laws of the respective States insofar as those laws are of general application to private persons or private property, is deemed desirable.[54]

Congress did not specifically consider the question which is before this court.

In *Bryan v. Itasca County*, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976), the Supreme Court refused to interpret Public Law 280 as a purely assimilationist piece of legislation. The Court emphasized that the grant of state jurisdiction was not intended to "result in the undermining or destruction of such tribal governments as did exist . . . ." 426 U.S. at 388, 96 S.Ct. at 2111, 48 L.Ed.2d at 721. The Court went on to note, in language strongly supporting the Community's position:

> The Act itself refutes such an inference: *there is notably absent any conferral of state jurisdiction over the tribes themselves* . . . . (emphasis added)

426 U.S. at 388–89, 96 S.Ct. at 2111, 48 L.Ed.2d at 721.

The issue decided by the Supreme Court in *Bryan* was the state's power, presumably conferred by 28 U.S.C. § 1360, to tax the personal property of some individual Indians which was located on the reservation. Thus respondent's contention that *Bryan* is distinguishable from the case at bar is certainly correct. But in our view the importance of the Supreme Court's opinion is the fact that the approach of the Supreme Court in *Bryan* was to determine, on the basis of legislative history and wording of the Act, what Congress expressly intended and to go no further.[55] In *Bryan*, the Supreme Court stated:

> . . . This omission has significance in the application of the canons of construction applicable to statutes affecting Indian immunities, as some mention would normally be expected if such a sweeping change in the status of tribal government and reservation Indians had been contemplated by Congress.

426 U.S. at 381, 96 S.Ct. at 2108, 48 L.Ed.2d at 717. Later the Court concluded:

> [I]f Congress in enacting Pub.L. 280 had intended to confer upon the States general civil regulatory powers, including taxation, over reservation Indians, it would have expressly said so.

426 U.S. at 390, 96 S.Ct. at 2112, 48 L.Ed.2d at 722.

---

**52.** Goldberg, *Public Law 280: The Limits of State Jurisdiction over Reservation Indians*, 22 U.C.L.A.L.Rev. 535, 542–43 (1975) [hereinafter cited as *Public Law 280*].

**53.** *See id.* at 543, and *Santa Rosa Band of Indians v. Kings County*, 532 F.2d 655, 661 (9th Cir. 1975).

**54.** H.R.Rep. No. 848, *supra* note 50, at 2412.

**55.** In its examination of the legislative history of this statute, the Court stated:

> Of special significance for our purposes, however, is the total absence of mention or discussion regarding a congressional intent to confer upon the States an authority to tax Indians or Indian property on reservations.

[T]he consistent and exclusive use of the terms 'civil causes of action,' 'aris[ing] in,' 'civil laws of general application to private persons and private property,' and 'adjudicat[ion],' in the Act and legislative history virtually compels our conclusion that the primary intent of § 4 was to grant jurisdiction over private civil litigation involving reservation Indians in state court.[56]

The question thus arises whether a suit against the Metlakatla Indian Community is "private civil litigation." While it is clear from *Bryan* that state regulatory functions such as taxing do not fall within the scope of the term, it is possible that a wrongful death action against a tribe might.

The Court of Appeals for the Ninth Circuit recently interpreted 28 U.S.C. § 1360 as it applied to the county's power to enforce its zoning ordinances on reservation lands in *Santa Rosa Band of Indians v. Kings County*, 532 F.2d 655 (9th Cir. 1975). As respondents point out, the case involved the application of a county ordinance rather than a state statute of general application and thus was an easier case in which to withhold jurisdiction than the case at bar. Although the court's holding that the ordinance could not be applied to reservation property is clearly distinguishable, the approach used by the court is worthy of note. The court first notes that when set against the backdrop of tribal sovereignty over reservation land, it is clear that the states have no power to regulate unless specifically granted that power by Congress. 532 F.2d at 658. Next, the court notes that an ambiguity exists in the statute, and that the canons of construction dictate that all ambiguities be resolved in favor of the Indians. 532 F.2d at 660. Finally, the court notes that while the congressional policy in effect at the time P.L. 83–280 was passed may have been pro-assimilationist, present federal policies favor "Indian autonomy, reservation self-government and economic self-development." 532 F.2d at 663. Thus, the court, like the Supreme Court in *Bryan*, adopted a narrow interpretation of the grant of state jurisdiction in 28 U.S.C. § 1360(a).

Employing an approach parallel to that used by the courts in *Bryan* and *Santa Rosa*, namely, that ambiguity is to be resolved in favor of the Indians and that 28 U.S.C. § 1360(a) is to be construed narrowly, we turn to the text of this statute. The statute provides an express grant of civil jurisdiction to six states, including Alaska,

> over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country . . to the same extent that such State . . has jurisdiction over other civil causes of action, and those civil laws of such State . . . . that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State . . . . .

Respondents argue that jurisdiction is conferred upon the state court via this statute because the case involves a claim for relief between Indians, and the state wrongful death statute, AS 09.55.580, is a "civil law . . . of general application to private persons or private property" as delineated in the statute. Petitioners argue that the statute does not confer jurisdiction over Indian tribes and point out the language which gives "civil laws . . . of general application to *private persons or private property*" the same force and effect within Indian country as within the rest of the state. They argue that the public/private distinction is elemental to our system of jurisprudence. There is no question that if this action involved an Indian suing another Indian or a suit between a

---

56. 426 U.S. at 385, 96 S.Ct. at 2109, 48 L.Ed.2d at 719.

In *Bryan*, the Court was also persuaded by the fact that the termination acts passed by the same Congress as P.L. 280 were quite explicit in subjecting the *tribes* to state law and taxation. *Id.* at 390, 96 S.Ct. at 2112, 48 L.Ed.2d at 722. Construing P.L. 280 in *pari materia* with those termination acts, the Court concluded that had Congress intended an extension of state regulatory power, including taxation, over reservation Indians, it would have expressly said so.

non-Indian and an Indian for an alleged wrongful death, jurisdiction would lie in the state court. However, the issue is one of the sovereign immunity of the tribe and the determination to be made is whether Congress intended 28 U.S.C. § 1360(a) as a waiver of tribal sovereign immunity.

 Pursuant to the analysis employed by the Supreme Court in *Bryan v. Itasca County*, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976), we hold that the sovereign immunity of the Metlakatla Indian Community was waived only if it is clear from the unambiguous language of 28 U.S.C. § 1360(a) and its legislative history that Congress intended such a waiver. As previously noted, the legislative history does not specifically mention any waiver of tribal sovereign immunity. The only reference in the legislative history which is at all relevant echoes the "general application to private persons or private property" language of the statute.[57] Our study of the question has convinced us that 28 U.S.C.

§ 1360(a) is ambiguous and that the legislative history offers little guidance in resolving that ambiguity. Of controlling significance is the absence of any clear waiver of sovereign immunity in the statutes. Since tribal sovereign immunity is a long recognized principle founded on strong public policy, we conclude that without an express congressional waiver of immunity we should not imply one.[58] We therefore hold that Congress, by virtue of its enactment of 28 U.S.C. § 1360(a), did not waive the sovereign immunity of the Indian tribes and thus the Metlakatla Indian Community has sovereign immunity with respect to the subject wrongful death actions.[59]

We next address the effect of the Community's purchase of liability insurance. In the superior court, respondents argued that summary judgment should be denied because the Metlakatla Indian Community had waived its sovereign immunity by purchasing liability insurance or had waived such immunity to the extent of its policy

---

**57.** H.R.Rep. No. 848, *supra* note 50, at 2412.

**58.** Note also the discussion of the termination acts referred to in note 56, *supra*.

**59.** As noted by this court in *Ollestead v. Native Village of Tyonek*, 560 P.2d 31, 34 (Alaska 1977), and *Calista Corp. v. Mann*, 564 P.2d 53, 57–58 (Alaska 1977), 28 U.S.C. § 1360(b) limits the jurisdictional grant in 28 U.S.C. § 1360(a). 28 U.S.C. § 1360(b) provides:

Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement or statute or with any regulation made pursuant thereto; or shall confer jurisdiction upon the State to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein.

We think it important to note that this subsection serves the same interest that the doctrine of sovereign immunity serves, *i. e.*, the preservation of tribal trust property from "encumbrances."

The property which is thus immune from state judgment execution in a P.L. 83–280 jurisdiction includes allotted real property. Com-

ment, *Indian Property and State Judgment Executions*, 52 Ore.L.Rev. 313, 317–18 (1973). *See generally Snohomish County v. Seattle Disposal Co.*, 70 Wash.2d 668, 425 P.2d 22 (Wash. 1967), *cert. denied*, 389 U.S. 1016, 88 S.Ct. 585, 19 L.Ed.2d 662. The critical question that would face the court if we found a waiver of sovereign immunity in § 1360(a) would be whether a state court judgment would "authorize the . . . encumbrance . . . of real or personal property . . . belonging to . . . any Indian tribe, band or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States . . . ." The record does not contain sufficient information to evaluate whether *all* property of the Community would be exempt and thus suit should not lie.

However, in our opinion § 1360(b) provides support for the conclusion that § 1360(a) was not intended to constitute a waiver of tribal sovereign immunity. If Congress had wanted to waive tribal immunity, it strikes us that it would have allowed execution against purely tribal assets, *e. g.*, tribal real property. Since the underlying reasons for the restrictions in § 1360(b) are similar to the underlying reasons for tribal sovereign immunity, construing the two subsections together, we conclude that § 1360(a) does not constitute a waiver of tribal sovereign immunity.

limits. Respondents relied upon a single authority, *Loncassion v. Leekity*, 334 F.Supp. 370 (D.N.M.1971), dealing with an Indian tribe's purchase of liability insurance. Respondents also analogized to cases involving municipal corporations which hold that the immunity of the municipal units concerned was waived to the extent of liability insurance obtained.[60] The Metlakatla Indian Community replied to this argument by distinguishing *Loncassion*, claiming that only Congress may waive the sovereign immunity of a tribe,[61] and distinguishing the basis for waiver of sovereign immunity of municipal bodies. Because the superior court found jurisdiction through a waiver of sovereign immunity in 28 U.S.C. § 1360(a), it did not address this issue. In light of our disposition of the sovereign immunity question, we think it appropriate to address the possible waiver.

*Loncassion* involved a civil rights action by two tribal members against a tribal police officer and the Zuni Pueblo. The Pueblo raised a sovereign immunity defense which the court denied. The court recognized the principle that the tribes are immune from suit without congressional authorization but found the Indian Civil Rights Act of 1968, 25 U.S.C. §§ 1301–03, under which plaintiffs were suing, to constitute such authorization. The court went on to hold that the Pueblo had waived its claim to immunity by the terms of an agreement between it and the B.I.A. The court stated:

> The Zuni Pueblo and the Bureau of Indian Affairs entered into an agreement whereby the Pueblo set up a law enforcement organization, including police officers, police equipment, facilities for prisoner care, and so on, and the Bureau of Indian Affairs provided about three-fifths of the funds. Among other things, the Pueblo agreed to 'be responsible for all damages or injury to any person or to property of any character * * *,' to pay attorney's fees, and to provide liability insurance to protect the Pueblo from suits brought because of wrongful conduct by tribal police officers. The terms of this contract waive the Pueblo's claim to sovereign immunity from suits claiming wrongful conduct by tribal police officers.[62]

Thus, since it is apparent that the court's holding did not rest on the purchase of insurance, but rather on the existence of the contractual provision, *Loncassion* is not strong support for respondents' argument.

As to whether the analogy should be drawn between the tribe and a municipal corporation such that purchase of insurance is deemed a waiver of sovereign immunity to the extent of coverage, several factors must be noted. First, in a majority of jurisdictions, it is held that procurement of insurance by a governmental unit does not affect the unit's governmental immunity.[63] However, it must also be noted that an increasing number of courts are finding a waiver of immunity,[64] a view which one commentary states "is worthy of characterization as enlightened."[65] In order to analyze the issue at bar, it is necessary to examine the reasons that the courts have given for finding a waiver of immunity.

---

**60.** *See, e. g., Longpre v. Joint School Dist. No. 2*, 151 Mont. 345, 443 P.2d 1 (Mont.1968); *Williams v. New Mexico State Highway Comm'n*, 82 N.M. 550, 484 P.2d 770 (N.M.1971); *Orleans Village v. Union Mut. Fire Ins. Co.*, 133 Vt. 217, 335 A.2d 315 (1975); *Sambs v. City of Brookfield*, 66 Wis.2d 296, 224 N.W.2d 582 (1975); *Collins v. Memorial Hosp.*, 521 P.2d 1339 (Wyo. 1974).

**61.** In *United States v. United States Fidelity and Guar. Co.*, 309 U.S. at 513, 60 S.Ct. at 657, 84 L.Ed. at 899, the Supreme Court said:

> But, it is said, that there was a waiver of immunity by a failure to object to the jurisdiction of the Missouri district court over the cross-claim. It is a corollary to immunity from suit on the part of the United States and the Indian Nations in tutelage that this immunity cannot be waived by officials. If the contrary were true, it would subject the government to suit in any court in the discretion of its responsible officers. This is not permissible. (footnote omitted)

**62.** 334 F.Supp. at 373.

**63.** Annot., 68 A.L.R.2d 1437, 1438 (1959).

**64.** *Id.* and later case service.

**65.** 68 A.L.R.2d at 1448.

A particularly lucid examination of waiver through insurance coverage is found in *Thomas v. Broadlands Community Consolidated School Dist.*, 348 Ill.App. 567, 109 N.E.2d 636 (1953). After examining the judicial history of municipal immunity in Illinois, the court found two possible bases for such immunity, namely, the principle that the sovereign cannot be sued without its consent and the principle, founded in public policy reasons, that in order to protect public funds moneys directed to those funds and governmental purposes should not be diverted to the payment of private tort judgments. 109 N.E.2d at 640. The court found that in the case before it, a personal injury suit against a school, neither of those principles was operative. The court concluded:

> The only justifiable reason for the immunity of quasi-municipal corporations from suit for tort is the sound and unobjectionable one that it is the public policy to protect public funds and public property, to prevent the diversion of tax moneys, in this case school funds, to the payment of damage claims. There is no justification or reason for absolute immunity if the public funds are protected. Their protection has been the real and historical reason for the absolute immunity both elsewhere and in Illinois accorded quasi-municipal corporations, and similarly, municipal corporations in the exercise of a governmental function. Liability insurance, to the extent that it protects the public funds, removes the reason for, and thus the immunity to, suit.[66]

Given this principle, it is necessary to determine if the analogy between municipal corporations and tribes is an apt and proper one which should lead us to the conclusion that the Community's sovereign immunity was waived to the extent of its insurance coverage. As discussed previously, one of the primary reasons for judicial recognition of tribal sovereign immunity has been the protection of tribal assets. Thus, the analogy is made that since the tribal funds are protected to the extent of insurance cover-

age, tribal funds would not be harmed. We think that this analogy is deficient for several reasons. First, it ignores the fact that insurance premiums tend to rise after claims have been paid. Second, the policy would encourage poor fiscal management by rewarding the tribe which did not prepare for the possibility that the courts may not recognize its claim to sovereign immunity. Thus, by encouraging those tribes with insurance to drop it and discouraging those tribes which do not have insurance from obtaining it, the policy opens the gate to uncovered loss if at some point the courts decide that the sovereign immunity defense is invalid. This problem is of particular importance in Indian affairs, since once the tribal property is dissipated by tort judgments, it is very difficult to replace. In municipal cases, the burden from the cost of accidents is spread throughout the community because the community can tax to replace the lost funds. However, most tribes do not have the ability to tax in a similar way because of the poverty of the individuals; once lost, the property cannot be replaced.

It is no doubt true that the Metlakatla Indian Community purchased insurance to protect itself against a court finding that it could not claim sovereign immunity. We do not believe that a waiver of sovereign immunity should be implied from an act which was intended to protect the tribal resources.

The essential differences between municipalities and tribes have led the courts not to recognize the proprietary act/governmental function test for application of sovereign immunity. As the Fifth Circuit said in *Maryland Casualty Co. v. Citizens National Bank*, 361 F.2d 517, 521–22 (5th Cir. 1966):

> The fact that the Seminole Tribe was engaged in an enterprise private or commercial in character, rather than governmental, is not material. It is in such enterprises and transactions that the Indian tribes and the Indians need protection. The history of intercourse between

---

66. 109 N.E.2d at 640–41.

the Indian tribes and Indians with whites demonstrates such need. . . . To construe the immunity to suit as not applying to suits on liabilities arising out of private transactions would defeat the very purpose of Congress in not relaxing the immunity, namely, the protection of the interests and property of the tribes and the individual Indians.

Similarly, we conclude that a holding that the Metlakatla Indian Community's sovereign immunity was waived to the extent of its insurance coverage would operate to defeat the purpose of the immunity.

We now reach the last remaining issue in this case, namely, the effect of a "sue and be sued" clause in the corporate charter of the Metlakatla Indian Community. After the parties' original briefs had been filed, this court ordered that the corporate charter of the Metlakatla Indian Community be made part of the record on appeal and that the parties be allowed to submit supplemental briefs on the effect of the "sue and be sued" clause on the Community's assertion of sovereign immunity.

The Corporate Charter of the Metlakatla Indian Community, ratified December 19, 1944, and amended December 9, 1949, was adopted in response to the invitation found in section 17 of the Indian Reorganization Act of 1934 (Wheeler-Howard Act), 25 U.S.C. § 477,[67] as made applicable to Alaska Native groups by the Act of May 1, 1936, 25 U.S.C. § 473a. Section 1 of the Charter sets forth the purpose as follows:

> In order to enable the Community and its members *to do various kinds of business* for their common welfare, the Community is hereby chartered as a corporation of the United States of America under the name of 'Metlakatla Indian Community.' (emphasis added)

Section 4 sets forth the powers of the corporation and states, in part:

> The corporation shall have the power to [*sic*] do the following things:
>
> . . . . .
>
> 'To sue and be sued;'
>
> . . . . .[68]

The Community also adopted a Constitution and By-Laws pursuant to § 16 of the Indian Reorganization Act of 1934, 25 U.S.C. § 476.[69] In the Preamble, it is stated:

**67.** 25 U.S.C. § 477 provides:

*Incorporation of Indian Tribes; charter, ratification by election.*

The Secretary of the Interior may, upon petition by at least one-third of the adult Indians, issue a charter of incorporation to such tribe: *provided*, That such charter shall not become operative until ratified at a special election by a majority vote of the adult Indians living on the reservation. Such charter may convey to the incorporated tribe the power to purchase, take by gift, or bequest, or otherwise, own, hold, manage, operate, and dispose of property of every description, real and personal, including the power to purchase restricted Indian lands and to issue in exchange therefor interests in corporate property, and such further powers as may be incidental to the conduct of corporate business, not inconsistent with law, but no authority shall be granted to sell, mortgage, or lease for a period exceeding ten years any of the land included in the limits of the reservation. Any charter so issued shall not be revoked or surrendered except by Act of Congress.

**68.** In response to the decision in *Martinez v. Southern Ute Tribe*, 150 Colo. 504, 374 P.2d 691 (1962), the Community passed Resolution 75–3 which sought to amend this provision to read:

To sue and to be sued in courts of competent jurisdiction within the United States; Provided, however, that sovereign immunity of the Community from suit shall be deemed waived only by express resolution of the Community Council and only to the extent specified in the resolution, and provided further, that this grant of power to sue and to be sued shall not be deemed a consent by the United States, and exercise of such power shall not be deemed a consent by the Community, to the levy of any judgment, lien, or attachment upon the property of the Community other than income or chattels specially pledged or assigned.

However, since the Secretary of the Interior has not approved the proposed change, the clause remains as quoted in the text.

**69.** 25 U.S.C. § 476 provides:

*Organization of Indian tribes; constitution and bylaws; special election.*

Any Indian tribe, or tribes, residing on the same reservation, shall have the right to organize for its common welfare, and may adopt an appropriate constitution and by-laws, which shall become effective when rati-

Now, therefore, we, the Metlakatla Indians of Annette Island Reserve, desiring to take advantage of the benefits available to Indian communities under the acts of Congress of May 1, 1936, and June 18, 1934, and to enjoy greater freedom and opportunity in the handling of our affairs and in providing for the welfare of our people do ordain and establish this Constitution for the Metlakatla Indian Community of the Annette Islands Reserve.

The Metlakatla Community's Constitution and By-Laws deal with establishing the structure and functions of the tribal government in a manner previously discussed.

The threshold question which must be answered is whether or not the "sue and be sued" clause is applicable to the case at bar. If the answer is in the affirmative then we must further determine the effect of the clause. Petitioners conclude, from a three-step analysis, that we need not reach the question of the effect of the "sue and be sued" clause on the Community's sovereign immunity. They point out, first, that the clause is part of the corporate charter, adopted pursuant to § 17 of the Indian Reorganization Act. Second, they argue that the tribal organization under the Indian Reorganization Act is bifurcated—the governmental aspects being treated under § 16 and the business or corporate aspects being treated under § 17. Finally, they take the position that the acts of alleged negligence in the case at bar concern only the governmental aspects of tribal organization. We think petitioners' analysis has merit.

fied by a majority vote of the adult members of the tribe, or of the adult Indians residing on such reservation, as the case may be, at a special election authorized and called by the Secretary of the Interior under such rules and regulations as he may prescribe. Such constitution and bylaws, when ratified as aforesaid and approved by the Secretary of the Interior, shall be revocable by an election open to the same voters and conducted in the same manner as the original constitution and bylaws.

In addition to all powers vested in any Indian tribe or tribal council by existing law, the constitution adopted by said tribe shall

In support of their assertion that § 16 governments and § 17 corporations are different entities, petitioners have submitted three Opinions of the Solicitor, Department of the Interior, No. M–36515 (Nov. 20, 1958), No. M–36545 (Dec. 16, 1958) and No. M–36119 (Feb. 14, 1952). Opinion No. 36119 dealt with two problems of contracting. The first involved a tribe which had organized under both §§ 16 and 17. The Solicitor concluded that "section 17 permits the Secretary to grant incorporated tribes far-reaching powers with respect to the conduct of business activities." M–36119 at 3. The second problem involved a tribe which had adopted a constitution under § 16, but had not incorporated under § 17. In that instance, the Solicitor opined that since § 16 did not grant the tribe any powers with respect to business operations, it would be necessary to comply with the requirements of section 2103 of the Revised Statutes, 25 U.S.C. § 81 (1946), a section prescribing several requirements essential to the formation of a valid contract with an Indian tribe.

Opinion No. M–36545 concerned, in part, a question as to whether tribal resources were held as an asset of the governmental unit, organized under § 16 or as an asset of the tribal business corporation organized under § 17. The Solicitor wrote:

If this land, or the timber thereon, has not been effectively transferred or conveyed to the tribal corporation, it is not a corporate asset, and remains the property of the constitutional organization of the tribe. For a recent study of the legal distinction between a tribal municipal

also vest in such tribe or its tribal council the following rights and powers: To employ legal counsel, the choice of counsel and fixing of fees to be subject to the approval of the Secretary of the Interior; to prevent the sale, disposition, lease, or encumbrance of tribal lands, interests in lands, or other tribal assets without the consent of the tribe; and to negotiate with the Federal, State, and local Governments. The Secretary of the Interior shall advise such tribe or its tribal council of all appropriation estimates or Federal projects for the benefit of the tribe prior to the submission of such estimates to the Bureau of the Budget and the Congress.

Government and a tribal business corporation, see Solicitor's Opinion M–36515, dated November 20, 1958. Ordinarily it is safe to assume that a transaction of a so-called 'organized tribe' is a transaction of the tribal municipal corporation, which may have as broad or broader economic powers as its business corporation counterpart. Unless documentary evidence such as a conveyance to the business corporation or contractual agreement, by resolution or otherwise, gives the business corporation an agency or proprietary relationship to certain property, it can be assumed that the corporation is not directly involved. Where the property or funds involved are created by the tribal corporation then transactions involving such resources are governed by the provisions of the charter. Since many constitutions and charters incorporate by reference the provisions of each other, the appropriate power is often similar for both legal entities. (footnote omitted) M–36545 at 2.

Opinion No. M–36515, 65 Interior Decision 483, is the opinion most relevant to the issue at bar. The Commissioner of Indian Affairs had requested an opinion as to whether an Indian tribe organized pursuant to § 16 of the Indian Reorganization Act was the same legal entity as the tribal corporation chartered pursuant to § 17. The Solicitor reviewed Opinion M–36119 (February 14, 1952), dealing with contractual powers, then went on to examine the legislative history of the Indian Reorganization Act which, he asserted, "makes clear the distinction between the organization of an Indian municipal government under section 16 . . . and that of a business corporation under section 17 of the act." The Solicitor concluded:

The purpose of Congress in enacting section 16 of the Indian Reorganization Act was to facilitate and to stabilize the tribal organization of Indians residing on the same reservation, for their common welfare. It provided their political organization. The purpose of Congress in enacting section 17 of the Indian Reorganization Act was to empower the Secretary to issue a charter of business incorporation to such tribes to enable them to conduct business through this modern device, which charter cannot be revoked or surrendered except by act of Congress. This corporation, although composed of the same members as the political body, is to be a separate entity, and thus more capable of obtaining credit and otherwise expediting the business of the tribe, while removing the possibility of federal liability for activities of that nature. As a result, the powers, privileges and responsibilities of these tribal organizations materially differ.

65 Int.Dec. at 484.

The legislative history of the Indian Reorganization Act, referred to in Opinion M–36515, is instructive. The original Wheeler-Howard Bill, H.R. 7902 and S. 2755, 73d Cong., provided for a single chartered entity with all powers of government and such privileges of corporate organization as were necessary for effective tribal structure.[70] In committee discussions, it was suggested that this type of organization would not suit the realities of Indian problems, primarily because of the difficulty in obtaining credit given the recognized sovereign immunity of the tribes.[71] The Senate Report on S. 3645, the completely redrafted bill, distinguished the purposes of stabilization of tribal governmental organization and modernization of tribal economic activities through the corporate structure.[72]

Based on the legislative history of the Indian Reorganization Act, it is apparent that Congress envisioned two separate legal entities in sections 16 and 17 of the Act. One commentator has stated:

70. *Tribal Self-Government, supra* note 44, at 962.

71. *Hearings on H.R. 7902*, 73d Cong., 2d Sess. 90–100 (1934).

72. S.Rep. No. 1080, 73d Cong., 2d Sess. (1934).

The purpose of adopting a charter is different than that of adopting a constitution, the charter being oriented more toward business than toward governmental organization.[73] (footnote omitted)

Felix Cohen also recognized the difference in the entities in stating:

Tribal constitutions adopted pursuant to section 16 of the act must be distinguished from charters issued pursuant to section 17. The former determine, primarily, the manner in which the tribe shall exercise powers based on existing law . . . ; tribal charters, on the other hand, involve new grants of power . . . .[74]

However, we note that there is a paucity of decisional authority on the separateness of the entities organized pursuant to sections 16 and 17 of the Indian Reorganization Act. Petitioners point to language in *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 151, 93 S.Ct. 1267, 1272, 36 L.Ed.2d 114, 121 (1973), in which the Supreme Court stated:

Unquestionably, the [Indian Reorganization] Act reflected a new policy of the Federal Government and aimed to put a halt to the loss of tribal lands through allotment. It gave the Secretary of the Interior power to create new reservations, and tribes were encouraged to revitalize their self-government through the adoption of constitutions and bylaws and through the creation of chartered corporations with power to conduct the business and economic affairs of the tribe. (footnote omitted)

The Supreme Court also cited a statement made by Senator Wheeler:

'This bill . . . seeks to get away from the bureaucratic control of the Indian Department, and it seeks further to give the Indians the control of their own affairs and of their own property; to put it in the hands either of an Indian Council or in the hands of a corporation to be organized by the Indians.'[75]

Petitioners argue that the use of the disjunctive, "or," in the above suggests the separateness of the entities.[76]

The decisional authority relating to the effect of a "sue and be sued" clause has not differentiated between section 16 entities and section 17 entities. In *Martinez v. Southern Ute Tribe*, 374 P.2d 691 (Colo. 1962), the Southern Ute Tribe had organized pursuant to both sections; a "sue and be sued" clause was contained in the corporate charter. Martinez was seeking an adjudication that she was a member of both tribe and corporation. The trial court dismissed the action based on lack of subject-matter jurisdiction. The Supreme Court of Colorado reversed, saying:

The defendant by adopting incorporation under 25 U.S.C.A. § 476 [*sic*] and consenting to sue and be sued in courts of competent jurisdiction within the United States, has rendered itself amenable to the courts of the State of Colorado in any action of which the state courts may take cognizance. It has recourse to the state courts for the protection of its own rights and is answerable in said courts to those who assert claims against it.[77]

However, the corporate charter of the Southern Ute Tribe did not distinguish between a governmental entity and a corporate entity. In fact, the section in which

74. Cohen, *supra* note 9, at 330. However, it should be noted that Cohen interpreted incorporation as changing the structure of the tribe rather than supplying an additional legal entity. *See id.* at 279.

75. 411 U.S. at 152, 93 S.Ct. at 1272, 36 L.Ed.2d at 121.

76. The grammatical structure of the sentence also supports the position that Wheeler contemplated an exclusive alternative, *i. e.*, that

the tribe could place control in either a council or a corporation, but not both. However, looking at the realities of the situation, 181 tribes accepted the act, 161 constitutions and 131 corporate charters have been adopted. *Tribal Self-Government, supra* note 44, at 972. Thus, it necessarily follows that many tribes, like the Metlakatlans, are organized under both sections.

77. 374 P.2d at 694.

the "sue and be sued" clause is found begins:

> The Tribe, subject to any restrictions contained in the Constitution and laws of the United States, or in the Constitution and Bylaws of the said Tribe, shall have the following corporate powers, in addition to all powers already conferred or guaranteed by the Tribal Constitution and By-Laws . . . .[78]

*Maryland Casualty Co. v. Citizens National Bank*, 361 F.2d 517 (5th Cir. 1966), *cert. denied*, 385 U.S. 918, 87 S.Ct. 227, 17 L.Ed.2d 143, concerned the immunity of the Seminole Tribe of Florida, Inc.[79] with respect to an ancillary action in garnishment to satisfy a judgment obtained against it. The main suit arose out of a contract for the construction of an office building and an arts and crafts center for the Tribe. The Tribe's charter contained a "sue and be sued" clause with a proviso that property of the Tribe other than income or chattels especially pledged or assigned was exempt from levy, lien or attachment. The Fifth Circuit held that the action involved in the appeal fell within the proviso and thus found immunity from suit. The Fifth Circuit's opinion utilized the canon of construction that doubtful expressions are to be resolved in favor of Indians. The court also

focused on the need to protect Indian commercial enterprises and found that the fact that the Seminole Tribe was engaged in such an enterprise was not material.[80] Thus, it is apparent that the Fifth Circuit would have been even more receptive to recognition of immunity with respect to governmental acts.[81]

■ In our view, the section 16 governmental unit and the section 17 corporate unit are distinct legal entities. Opinions of the Solicitor are entitled to weight as representing the construction given to the statute by the executive department charged with its execution.[82] The legislative history of the Indian Reorganization Act also supports a determination of separateness. Additionally, we think a construction which recognizes two legal entities would be indicated by considerations of sound public policy. There is little doubt that the claims to sovereign immunity have been allowed in the courts in order to protect the limited and irreplaceable resources of the Indian tribes from large judgments. However, strict application of the immunity principle could severely retard the tribe's economic growth in a modern business world. Recognition of two legal entities, one with sovereign immunity, the other with the possibili-

78. *Quoted in Martinez v. Southern Ute Tribe*, 374 P.2d at 693.

79. The Tribe was incorporated pursuant to § 17 of the Indian Reorganization Act.

80. 361 F.2d at 521. This portion of the Fifth Circuit's opinion is quoted at 169–170, *supra*.

81. Respondents have directed us to other cases involving "sue and be sued" clauses. *Fontenelle v. Omaha Tribe*, 430 F.2d 143 (8th Cir. 1970), involved a quiet title action against the Omaha Tribe with respect to land formed by the meandering of the Missouri River. The Eighth Circuit held that by adopting a "sue and be sued" clause in its corporate charter, the Omaha Tribe "rendered itself amenable to a quiet title action." 430 F.2d at 147. The clause was very similar to the one in *Maryland Casualty*. The court did not discuss the chartering process or even mention the Indian Reorganization Act. *Brunette v. Dann*, 417 F.Supp. 1382 (D.Idaho 1976), involved a suit by an associate tribal justice against the Shoshone-Bannock Tribe, the tribal business coun-

cil, and the chief tribal judge for deprivation of civil rights. The district court held both that the federal court had jurisdiction over alleged violations of the Indian Civil Rights Act and that the "sue and be sued" clause in the Tribe's corporate charter waived the Tribe's sovereign immunity. The other cases cited by respondents, *Pambrun v. Blackfeet Tribe*, 400 F.Supp. 1394 (D. Mont.1975), and *Enterprise Elec. Co. v. Blackfeet Tribe of Indians*, 353 F.Supp. 991 (D. Mont.1973), resulted in dismissals of federal actions on jurisdictional grounds. The courts held in those two cases that despite "sue and be sued" clauses, the federal courts lacked jurisdiction because the cases were not federal question or diversity cases.

82. *See, e. g., United States v. Jackson*, 280 U.S. 183, 193, 50 S.Ct. 143, 146, 74 L.Ed. 361, 366 (1930); *Assiniboine & Sioux Tribes v. Nordwick*, 378 F.2d 426, 429 (9th Cir. 1967), *cert. denied*, 398 U.S. 1046, 88 S.Ct. 764, 19 L.Ed.2d 838 (1968). *See also* K. Davis, Administrative Law Treatise § 5.06 (1958).

ty for waiver of that immunity, would enable the tribes to make maximum use of their property. The property of the corporation would be at risk, presumably in an amount necessary to satisfy those with whom the tribe deals in economic spheres. Yet some of the tribal property could be kept in reserve, safe from a judgment execution which could destroy the tribe's livelihood, in recognition of the special status of the Indian Tribe.[83]

■ Having determined that section 16 governmental units and section 17 corporations are separate legal entities, it must be determined which aspect is involved in the litigation that is the subject of the suit involved in this petition. The acts of negligence alleged in the complaint all deal with the actions of the police and the Community's training of them. The complaint also alleged that the Community was a "public corporation organized under federal law and exercising most, if not all of the functions of a city or borough in Alaska." Thus, we conclude that the acts alleged in the complaint relate to governmental functions. Therefore, we hold that the "sue and be sued" clause has no effect on the litigation in the instant case.

In conclusion, we have determined that the Metlakatla Indian Community should be accorded the same treatment as other Indian tribes; thus, we hold that the Community possesses sovereign immunity. We have further determined that 28 U.S.C. § 1360(a) does not constitute a waiver of tribal sovereign immunity. Similarly, we have concluded that the Community's purchase of liability insurance does not waive its sovereign immunity. In light of our conclusion that the tribal governmental units and the tribal corporations organized pursuant to sections 16 and 17, respectively, of the Indian Reorganization Act of 1934 are separate legal entities we have concluded that the "sue and be sued" clause in the corporate charter of the Community has no effect on the suit involved in this matter. Thus, we reverse and remand to the superior court for entry of summary judgment in favor of the petitioners on the first two counts of respondent's complaint.

BOOCHEVER, Chief Justice, dissenting.

I dissent from the majority opinion in this case. Although the courts and the commentators provide little support for my position, I believe that the outmoded doctrine of sovereign immunity is inapplicable in this case, and that the motion for summary judgment was improperly granted.

Title 28 U.S.C. § 1360(a)[1] confers jurisdiction on Alaskan courts over civil causes

---

**83.** Implicit in these conclusions is our determination that the cases, *Martinez, Maryland Casualty* and *Fontenelle* are either not persuasive or are distinguishable from the case at bar. We do not find *Martinez* persuasive, primarily because the Colorado Supreme Court does not address the difficult issues inherent in a case of that kind. However, *Martinez* is also readily distinguishable; it involved suit against a tribe which had mixed the governmental and corporate entities in the corporate charter and thus, at least arguably, had waived immunity for all purposes. In the case at bar, the clause, by its terms, applies only to the corporation. *Maryland Casualty* involved actions that were clearly of a corporate nature; thus, even under the distinction articulated here, the tribe would be subject to suit. *Fontenelle* is more difficult to distinguish because it involved rights to land which may have been the property of either

aspect of the tribe. However, since the issue was not discussed in *Fontenelle,* we do not consider it appropriate precedent for resolution of the issue in the case at bar.

1. 28 U.S.C. § 1360(a) states:
 State civil jurisdiction in actions to which Indians are parties
 (a) Each of the States or Territories listed in the following table shall have jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country listed opposite the name of the State or Territory to the same extent that such State or Territory has jurisdiction over other civil causes of action, and those civil laws of such State or Territory that are of general application to private persons or private property shall have the same force and effect within such Indian

of action to which Indians are parties which arise in Indian country. Since this case falls within that category, the Alaskan courts have jurisdiction to determine whether the doctrine of sovereign immunity bars this action. To make this determination, I would initially look to 25 U.S.C. § 1302,[2] the Indian Bill of Rights, by way of analogy. This section prohibits Indian tribes from abridging civil rights in their exercise of self-government. Although the statute does not expressly waive the immunity of the tribes, such waivers have been inferred.[3] Moreover, claims for damages under 1302 have been upheld.[4]

In my view, the reasons for permitting a waiver of immunity in cases involving civil rights are equally applicable to tort action. Both involve the conduct of governmental officials of the tribe and can result in monetary judgments. Additionally, I believe that both actions may be brought in state court.[5]

The integrity and vitality of tribal self-government will be no more impaired by allowing tort suits than by permitting actions under § 1302. Furthermore, just as the Indian Bill of Rights could be considered to strengthen tribal self-government by assuring the liberties of its individ-

country as they have elsewhere within the State or Territory:

State or
Territory of Indian country affected
Alaska ........... All Indian country within the Territory

 . . . . .

2. 25 U.S.C. § 1302 provides:

Constitutional rights

No Indian tribe in exercising powers of self-government shall—

(1) make or enforce any law prohibiting the free exercise of religion, or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble and to petition for a redress of grievances;

(2) violate the right of the people to be secure in their persons, houses, papers, and effects against unreasonable search and seizures, nor issue warrants, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or thing to be seized;

(3) subject any person for the same offense to be twice put in jeopardy;

(4) compel any person in any criminal case to be a witness against himself;

(5) take any private property for a public use without just compensation;

(6) deny to any person in a criminal proceeding the right to a speedy and public trial, to be informed of the nature and cause of the accusation, to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and at his own expense to have the assistance of counsel for his defense;

(7) require excessive bail, impose excessive fines, inflict cruel and unusual punishments, and in no event impose for conviction of any one offense any penalty or punishment greater than imprisonment for a term of six months or a fine of $500, or both;

(8) deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of law;

(9) pass any bill of attainder or ex post facto law; or

(10) deny to any person accused of an offense punishable by imprisonment the right, upon request, to a trial by jury of not less than six persons.

3. *Loncassion v. Leekity*, 334 F.Supp. 370 (D.N.M.1971). Other cases applying a similar analysis include *Brunette v. Dann*, 417 F.Supp. 1382 (D.Idaho 1976); *Means v. Wilson*, 522 F.2d 833 (8th Cir. 1975); *Dry Creek Lodge, Inc. v. United States*, 515 F.2d 926 (10th Cir. 1973); *Johnson v. Lower Elwha Tribal Community of Lower Elwha Indian Reservation, Washington*, 484 F.2d 200 (9th Cir. 1073); *Williams v. Sisseton-Wahpeton Sioux Tribal Council*, 387 F.Supp. 1194 (D.S.D.1975). *See also Fontenelle v. Omaha Tribe of Nebraska*, 430 F.2d 143 (8th Cir. 1970). In *Fontenelle*, the court interpreted the provisions of 25 U.S.C. § 345 as a waiver of sovereign immunity. That section creates a cause of action in district court for any person of Indian blood who alleges an unlawful denial or exclusion from an allotment.

4. *See Lohnes v. Cloud*, 366 F.Supp. 619 (D.N.D. 1973); *Loncassion v. Leekity*, 334 F.Supp. 370 (D.N.M.1971).

5. Plaintiffs below alleged an additional cause of action based on 28 U.S.C. § 1302, claiming that the Metlakatla policemen conspired to violate their civil rights. The superior court concluded that state courts lacked jurisdiction to hear this claim. Although no appeal was taken from that ruling, I believe that a § 1302 action is a "civil action between Indians or to which Indians are parties" and falls within the scope of jurisdiction granted to state courts by 28 U.S.C. § 1360(a).

ual members, tort actions may have the salutary effect of encouraging the tribe to perform its governmental functions with greater care.

The majority bolsters its reading of the case law with the policy argument that the protection of tribal assets is an additional reason for upholding the immunity of the community. I find this argument unpersuasive. Title 28 U.S.C. § 1360(b) [6] prohibits state courts from adjudicating rights in certain tribal property.[7] Therefore, as long as property belonging to the tribe is held in trust or subject to restraints on alienation, it is immune from execution, regardless of whether suit against the community is allowed. Instead, a judgment against the tribe could be satisfied by insurance proceeds. There is no prohibition against the community's obtaining insurance, and in fact, the record of this case indicates that insurance was obtained. In all likelihood, the position taken by the community in this litigation was dictated by the policy provisions requiring cooperation with its carrier.[8]

In conclusion, I find no reason that Metlakatla should be treated differently from other Alaskan communities for purposes of liability. The history of the community is unlike that of other Alaskan Natives and the Indians of the other states and suggests almost total integration into Alaskan life and government.[9] It is true that in *Metlakatla Indian Community v. Egan*, 369 U.S. 45, 82 S.Ct. 552, 7 L.Ed.2d 562 (1962), the United States Supreme Court held that federal regulations permitting the use of fish traps precluded the assertion of state authority to prohibit them. However, like *Bryan v. Itasca County*, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976),[10] the *Metlakatla* case involved a question of state regulatory laws rather than application of common law permitting private causes of action against governmental bodies. While subjecting tribal governments to "the full panoply of civil regulatory powers" may raise legitimate concerns regarding the continued viability of Indian self-government,[11]

**6.** 28 U.S.C. § 1360(b) states:
> (b) Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall confer jurisdiction upon the State to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein.

**7.** The majority in Footnote 59 recognizes that § 1360(b) prohibiting alienation or encumbrance of property of an Indian tribe that is held in trust by the United States or is subject to a restriction on alienation imposed by the United States "serves the same interest that the doctrine of sovereign immunity serves, i. e., the preservation of tribal trust property from 'encumbrances.'" It seems to me that a strong argument may be made that Congress had no need to insert such statutory immunity if it had not intended that suits could be brought against Indian tribes under authority of § 1360(a).

**8.** The policy states:

> (c) The *insured* shall cooperate with the company and, upon the company's request, assist in making settlements, in the conduct of suits and enforcing any right of contribution or indemnity against any person or organization who may be liable to the *insured* because of injury or damage with respect to which insurance is afforded under this policy; and the *insured* shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The *insured* shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident.

**9.** *See Metlakatka Indian Community v. Egan*, 369 U.S. 45, 82 S.Ct. at 556–57, 50–51, 7 L.Ed.2d 562, 567–68 (1962).

**10.** *Bryan* involved an action brought by a reservation Indian seeking a declaration that the county lacked authority to impose a personal property tax on his mobile home located on land held in trust. Narrowly interpreting § 1360(a), the Supreme Court reversed the decision below and held that the grant of jurisdiction and of applicability of state laws did not also grant the state the authority to tax.

**11.** 426 U.S. at 388–89, 96 S.Ct. at 2111, 48 L.Ed.2d at 721.

such threats do not appear to be posed by permitting private tort actions.

The position adopted by the court is reminiscent of cases upholding the sovereign immunity of municipalities. The need for immunity was explained in part on the basis that: (1) there were no corporate funds out of which satisfaction could be obtained; (2) the municipality derives no profit from the exercise of its government functions, which are solely for the public benefit and (3) cities cannot carry on their governments if money raised by taxation for public use is diverted to making good the torts of employees. According to Prosser, however:

> Virtually all writers have agreed that no one of these reasons for denying liability is sound, and all of them can be found to have been rejected at one time or another in the decided cases. The current of criticism has been that it is better that the losses due to tortious conduct should fall upon the municipality rather than the injured individual, and that the torts of public employees are properly to be regarded, as in other cases of vicarious liability, as a cost of the administration of government, which should be distributed by taxes to the public. Whether as a result of this criticism or not, there has been a marked and steady trend in the direction of an extension of municipal tort liability, either by finding that the particular activity of the defendant is not a "governmental" one, or by discovering special reasons to take it out of the general rule. For many years, however, the courts were so far bound and hogtied by precedent and existing classifications, that it appeared that any real reform of the law must come by statutes. It is only quite recently that any general movement for alteration of the common law has been initiated. (footnotes omitted) [12]

The majority is under the impression that this dissent overlooks the supremacy of federal law as it pertains to tribal sovereign immunity. Tribal sovereign immunity has not been established by statute, but is a federally court-made doctrine.[13] As such, it is subject to modification by the federal courts and also to determinations as to its applicability to particular facts and circumstances. There has been no federal decision as to the applicability of the doctrine to tribal sovereign immunity involving suits brought by Indians for torts of the Metlakatla community, and of the applicability of 28 U.S.C. § 1360 to such litigation. This dissent in its suggested disposition of the suit recognizes that a federal question is involved, but until that question is resolved by the United States Supreme Court, a state court may use its best judgment in determining the nature of the applicable federal law. For the reasons outlined above, I believe that the doctrine of tribal sovereign immunity should not be applicable.

I would hold that the suit is not barred by sovereign immunity and would affirm the decision below.

---

**12.** W. Prosser, The Law of Torts, pp. 978–79 (4th ed. 1971).

**13.** The doctrine evolved from the case of *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832).